Alex R. Straus, Cal. Bar No. 321366
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive, PH Suite
Beverly Hills, CA 90212
Phone: (919) 600-5000
astraus@milberg.com

Amanda McGovern (*pro hac vice forthcoming*)
amcgovern@riveromestre.com
David DaPonte (*pro hac vice forthcoming*)
ddaponte@riveromestre.com
**RIVERO MESTRE LLP**
2525 Ponce de Leon Blvd., Suite 1000
Miami, FL 33134
Telephone: (305) 445-2500
Facsimile: (305) 445-2505

Eduardo E. Bertran (*pro hac vice forthcoming*)
ebertran@armaslaw.com
**ARMAS BETRAN ZINCONE**
4960 SW 72 Avenue, Ste. 206
Miami, Florida 33155
Phone: (305) 661-2021

Frank C. Quesada (*pro hac vice forthcoming*)
fquesada@msprecoverylawfirm.com
John W. Cleary (*pro hac vice forthcoming*)
jcleary@msprecoverylawfirm.com
**MSP RECOVERY LAW FIRM**
2701 S Lejeune Road 10th Floor
Coral Gables, Florida, 33134
Phone: (305) 614-2222

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware entity,<br><br>Plaintiff,<br><br>v.<br><br>AVANIR PHARMACEUTICALS, INC.,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, MSP Recovery Claims, Series LLC, ("MSPRC"), for itself and on behalf of a Class of similarly situated third-party payers ("TPP"), brings this action against Defendant Avanir Pharmaceuticals, Inc., ("Avanir") and states the following:

## INTRODUCTION

1.     Avanir manufactures, markets, and sells a drug product containing dextromethorphan hydrobromide and quinidine sulfate, which markets under the trade name Nuedexta ("Nuedexta"). The U.S. Food and Drug Administration ("FDA") approved Nuedexta for one use—the treatment of pseudobulbar affect ("PBA")—an extremely rare condition affecting 0.5% to 2% of Americans characterized by episodes of sudden and uncontrollable laughing or crying that do not reflect a person's actual emotions.

2.     While the FDA approved Nuedexta for the treatment of PBA arising from multiple sclerosis ("MS") and amyotrophic lateral sclerosis ("ALS"), it did not approve prescribing Nuedexta for patients with other types of emotional liability than can commonly occur in patients with Alzheimer's disease and other dementias.

3.     Despite the FDA's limited approval, Avanir aggressively marketed and promoted Nuedexta by expanding the drug's application to include treating PBA-like symptoms. To bolster its marketing strategy, Avanir funded a "study" linking Nuedexta to a decrease in PBA-like symptoms in patients. Four of the five doctors who authored the study were paid by Avanir, and the other author was an Avanir employee.

4.     Avanir used the study to further its scheme to promote and market Nuedexta beyond actual PBA diagnoses, in turn driving up Nuedexta's sales. But that's not all. Avanir also provided illegal kickbacks and incentives to doctors to prescribe Nuedexta, which ultimately led to the U.S. Department of Justice (the "DOJ") filing a criminal action against Avanir. Avanir ultimately agreed to enter into a Deferred Prosecution Agreement

("DPA" or "Agreement"), whereby Avanir admitted its scheme. The DPA is attached as **Exhibit A**.

5.     Plaintiff's TPP assignors, which provide benefits under Medicare Part C or D, and the TPP Class Members, were the ultimate targets and victims of Avanir's scheme. Patient accessibility to Nuedexta was a central part of Avanir's unlawful scheme. Through its scheme, Avanir induced Plaintiff's assignors and the Class Members to include Nuedexta in their formularies largely without any prior authorizations or restrictions. Further, Avanir kept the price of Nuedexta fairly low to ensure the drug was predominately paid by the TPPs like Plaintiff's assignors and the Class Members. Thus, Avanir caused Plaintiff's assignors and the Class Members to pay more for Nuedexta than they otherwise would have had they known of Avanir's scheme to push off-label Nuedexta and provide kickbacks to physicians.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for each of the non-federal claims.

7.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because at least one member of the class is a citizen of a different state than the Defendant and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendant because it is (i) authorized and licensed to conduct business in California, (ii) has its principal place of business in this judicial district, (iii) maintains and carries on systematic and continuous contacts in this judicial district, (iv) regularly transacts business within this judicial district, and (v) regularly avails itself of the benefits of this judicial district.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2).

CLASS ACTION COMPLAINT

**PARTIES**

10.     Plaintiff MSPRC Recovery Claims, Series LLC ("MSPRC") is a Delaware series limited liability company with its principal place of business at 2701 S. Lejeune Road, 10th Floor, Coral Gables, Florida 33134. MSPRC's limited liability company agreement provides for the establishment of one or more specific series. All records of all series are maintained together with all assets of MSPRC.

11.     Plaintiff is the assignee of claims arising from the payments of prescription drugs on behalf of Medicare beneficiaries. Plaintiff's assignors paid for Nuedexta at all relevant times. Pursuant to its operating agreement, MSPRC has the right and authority to pursue claims assigned to its series limited liability companies.

12.     Certain healthcare benefit providers have assigned their recovery rights to assert the claims alleged in this Class Complaint to Series LLCs of MSPRC. Pursuant to MSPRC's limited liability agreement, all rights arising from the assignment to its series, along with the right to bring any lawsuit in connection with that assignment, belong to MSPRC. As such, MSPRC has the right and power to sue defendants to recover the payments at issue in this action.

13.     Certain series of MSPRC have executed irrevocable assignments of any and all rights to recover payments made on behalf of their assignors' health plan members and enrollees. These assignments authorize the series and, in turn MSPRC through its operating agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits. For example, and only to serve to further demonstrate standing, MSPRC alleges the following assignment below:

14.     On May 12, 2017, Summacare, Inc. ("Summacare") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP

4

CLASS ACTION COMPLAINT

Recovery, LLC ("MSP Recovery"). Specifically, the assignment provides the following language:

> [Summacare] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [Summacare's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [Summacare] that [Summacare] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [Summacare] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".

15.     On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the Summacare Assignment to Series 16-11-509, a designated series of MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among [Summacare] . . . and [MSP Recovery] . . . .

16.     Summacare consented to, acknowledged, approved, and ratified the assignment from MSP Recovery to Series 16-11-509, which is memorialized in a letter dated September 5, 2018.

17.     Defendant, Avanir Pharmaceuticals, Inc. ("Avanir") is a biopharmaceutical incorporated in Delaware with its principal place of business at 30 Enterprise, Suite 200, Aliso Viejo, California 92656.

CLASS ACTION COMPLAINT

**FACTUAL ALLEGATIONS**

**I.   Nuedexta, a Drug Approved by the FDA to Treat Pseudobulbar Affect, a Rare Neurological Condition**

18.   Pseudobulbar affect is a condition characterized by episodes of sudden and uncontrollable laughing or crying that is not indicative of a person's actual emotional state.[1] PBA is the resulting cause of a neurological disease, including a stroke, dementia, traumatic brain injury, and Parkinson's disease.[2]

19.   PBA is rare.  It is estimated that only 0.5% to 2% of Americans suffer from PBA.[3]

20.   There is no cure for PBA. To address PBA, doctors prescribe treatments to manage PBA's symptoms to improve the patient's quality of life. PBA is managed through regular, recurring treatments over the course of a patient's life.

21.   Pharmacological treatment for PBA is not appropriate for all patients with this condition. As such, treatment for PBA is equally targeted to the underlying disease that gave rise to PBA, as opposed to pharmacological treatment of PBA alone i.e., dementia drugs.

22.   On October 29, 2010, the FDA approved the drug Nuedexta for a single use: treatment of PBA. At that time, and at all relevant times thereafter, Avanir's primary marketed product was Nuedexta. Avanir commercially launched Nuedexta to the public in February 2011. Avanir currently has patent exclusivity over Nuedexta until 2026.

---

[1] *Pseudobulbar Affect*, Nat'l Center for Advancing Translational Sciences, https://rarediseases.info.nih.gov/diseases/12012/pseudobulbar-affect#ref_7191(last visited Apr. 20, 2022).

[2] *Pseudobulbar Affect Infographic*, Am. Stroke Ass'n, https://www.stroke.org/en/help-and-support/support-group-leader-resources/lesson-modules/pseudobulbar-affect/pseudobulbar-affect-infographic (last visited Apr. 20, 2022).

[3] *Pseudobulbar Affect (PBA)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/17928-pseudobulbar-affect-pba (last visited Apr. 20, 2022).

CLASS ACTION COMPLAINT

23.     The FDA's approval for Nuedexta for PBA was limited to patients with a PBA diagnosis arising from MS or ALS. The FDA did not approve—and the prescription label warned against—prescribing Nuedexta for patients with other types of emotional liability than can commonly occur in patients with Alzheimer's disease and other dementias.

24.     Despite the low prevalence of PBA among the general population, Avanir aggressively marketed Nuedexta and shoved it into the market by any means necessary, including broadening the scope of what Nuedexta can treat and redefining what PBA is to the medical community, e.g., marketing non-PBA symptoms as PBA.

25.     Avanir funded and provided editorial support for the manuscript preparation of the study titled "PRISM: A Novel Research Tool to Assess the Prevalence of Pseudobulbar Affect Symptoms Across Neurological Conditions" (the "PRISM study"). Although the PRISM study was published by a group of five doctors, a closer inspection reveals that each of these doctors received separate funding from Avanir for the study, and one of the doctors was an Avanir employee.

26.     The PRISM study focused on the prevalence of the symptoms of PBA—not the prevalence of a PBA diagnosis. Avanir used the PRISM study through its salesforce to promote Nuedexta as a treatment for symptoms of PBA and not PBA itself, the only FDA-approved use of Nuedexta.

27.     Avanir directed its sales representatives to distribute *summaries* of the PRISM study to physicians. Thus, Avanir was promoting Nuedexta as a treatment for patients experiencing symptoms of PBA, even though this went beyond the FDA's approval of Nuedexta.

28.     By redefining PBA to include other diagnoses and unfoundedly touting its increased prevalence, Avanir was broadening the market of people who would be eligible for Nuedexta. Because PBA is secondary to an underlying neurological disorder, Avanir

CLASS ACTION COMPLAINT

began marketing Nuedexta for patients with disorders more common than PBA, including Alzheimer's and dementia. Most patients with Alzheimer's and dementia tend to be 65 years old and older whom Medicare provides with health and prescription drug insurance.

29.     Avanir induced doctors to prescribe Nuedexta to more patients through kickbacks and fraudulent marketing.

30.     Plaintiff's assignors and the Class Members were the intended victims of the kickback scheme because they had to pay for the influx of prescriptions for Nuedexta.

## II.     Nuedexta Coverage Under Medicare and Medicaid

31.     For a drug to qualify for Medicare Part D reimbursement, the Medicare Prescription Drug Benefit Manual requires that the drug be provided only for "medically accepted indications." A medically accepted indication includes FDA approved uses or off-label uses supported by one or more of three compendia specified in Section 1927(g)(1)(B) of the Social Security Act. None of the compendia listed any approved off-label uses for Nuedexta. As such, Nuedexta qualified for Medicare Part D reimbursement only when provided for its FDA-approved use—the treatment of PBA.

### A.     Off-label Marketing

32.     Further, it is illegal for a drug company to market or knowingly sell its products for off-label use.

33.     Nonetheless, Avanir illegally marketed Nuedexta for off-label use. Through its illegal marketing of Nuedexta, Avanir misrepresented PBA thereby expanding the potential patient population and misleading prescribers into believing that their patients had PBA when they did not. Thus, prescribers wrote prescriptions for people who were not diagnosed with, and did not have, PBA.

34.     For its scheme to work, Avanir needed to ensure that Nuedexta was accessible to patients under their health insurance plan, whether under a commercial health insurance policy or Medicare. Avanir considered Nuedexta's pricing and the relation to

formulary placement throughout its scheme to increase prescriptions. By purposely keeping prices lower, Nuedexta remained in a lower tier in a plan's formulary; thus, avoiding detection of proliferation and further scrutiny.

35.     Avanir's aggressive marketing scheme touting the PRISM study and blurring the lines between PBA symptoms and a PBA diagnosis also induced Plaintiff's assignors and the Class Members to largely eliminate formulary restrictions on Nuedexta. According to Avanir's internal documents, 66% of commercial health plans and 65% of Medicare Part D plans included Nuedexta in their formularies as a preferred drug without any restrictions in May 2015. Avanir touted the fact that nearly 9 million additional seniors had unrestricted access to Nuedexta from 2014 to 2015.

36.     Plaintiff's assignors alone paid over $5.2 million for Nuedexta prescriptions throughout the time that Avanir engaged in an illegal kickback scheme with prescribers to increase prescriptions of Nuedexta.

### III.   Otsuka Pharmaceuticals Joins the Scheme to Increase Nuedexta Prescriptions

37.     In December 2014, Otsuka Pharmaceutical Co., Ltd.'s ("Otsuka Pharmaceutical") announced the acquisition of Avanir through a $3.5 billion all-cash tender offer. On January 13, 2015, the transaction closed, making Avanir a wholly owned subsidiary of Otsuka America, Inc. ("Otsuka America"). Otsuka America is a subsidiary of Otsuka Pharmaceutical.

38.     Prior to the acquisition, Avanir was comprised of approximately 500 employees. Of those 500 employees, 330 were pharmaceutical sales representatives who were tasked with promoting Nuedexta, which, at the time, was Avanir's only FDA approved prescription drug.

39.     However, Avanir's acquisition fortified the Nuedexta sales force with an additional 300 Otsuka sales representatives at a minimum.

40.     This expanded sales force of Nuedexta would result in "[m]ore noise, more adoption, [and] more patients being helped!"

41.     During a company-wide presentation on March 11, 2015, at Avanir's National Sales Meeting, Eric Benevich (Avanir's Vice President for Marketing) announced Otsuka's reinforcement initiative. The following week, Otsuka's sales representatives were trained on the misinformation about Nuedexta by Avanir employees, using Avanir training material. Shortly thereafter, Otsuka representatives were peddling misinformation and kickbacks alongside Otsuka's Avanir counterparts.

## IV.   Placing Profits Over Medical Independence and Patient Safety

42.     Doctors take a Hippocratic Oath to treat patients to the best of their abilities and put patients first. Once in bed with Avanir, however, the line between doing what's best for a patient and obtaining profits for personal gain begins to blur.

### A.   Outlining the Kickback Scheme

43.     Avanir promotes Nuedexta through a speaker's bureau program. Through the speaker's program, Avanir engaged doctors to promote Nuedexta to other medical professionals using fraudulent marketing materials.

44.     Upon information and belief, typical speaking engagements were held in restaurants where Avanir would pay the physician a standard fee for each engagement, pay for the physician's meal, and reimburse the physician's travel expenses. In addition, Avanir held speaking engagements in a physician's own office. Attendance at the speaking engagements is generally small, often five (5) to ten (10) physicians.

45.     Further, for the speaking engagements, Avanir limited a physician's presentation to materials prepared by Avanir and required the physician not deviate from the focus on the prevalence of PBA, the PRISM study, and off-label use of Nuedexta.

46.     Avanir approves an annual speaker program budget, which is distributed to its sales representatives for them to use to pay prescribers of Nuedexta to appear at speaking engagements.

47.     Upon information and belief, Avanir evaluates employee performance solely on the amount of prescriptions written, including refills, in each of the sales representatives' respective territories—not the amount of new prescribers in the sales representatives' assigned territory. To further fuel employee performance, Avanir creates a competitive environment between the sales representatives by ranking them based on the number of prescriptions written in each of their territories and providing end of year incentives to the highest ranked employees.

48.     Avanir employees were tasked with maximizing the number of prescriptions in each of their territories and with minimal to indifferent oversight.

49.     One way that Avanir sales representatives increased the number of prescriptions in their territories was by leveraging Avanir's speaker engagement budget.

50.     Avanir sales executives intended for speaker fees to be used to induce prescribers to increase prescriptions of Nuedexta.

51.     Avanir induced prescribers to become high prescribers of Nuedexta to beneficiaries of federal healthcare programs, offered prescribers financial incentives to write Nuedexta prescriptions for beneficiaries of federal healthcare programs, and induced prescribers to recommend that other prescribers prescribe Nuedexta to beneficiaries of federal healthcare programs, regardless of the patient's diagnosis.

52.     Avanir provided speaking engagements to physicians who constantly prescribed Nuedexta.

53.     The kickbacks were not limited to speaking engagements though. Executives and other employees at Avanir agreed to use payments to prescribers, including speaker

CLASS ACTION COMPLAINT

fees and honoraria, to induce the prescribers to maintain and increase their Nuedexta prescribing volume.

**B.   Avanir Paid the Highest Prescribers of Nuedexta Thousands of Dollars**

54.   Over the years, Avanir has paid millions of dollars to prescribers of Nuedexta.[4] For example, the allegations below involving two doctors illustrate how the scheme played out.

55.   From October 2011 through around February 2016, Avanir paid Dr. Deepak Raheja ("Dr. Raheja") over $330,000 in honoraria for speaking engagements related to Nuedexta. Dr. Raheja gave approximately 211 speaking presentations, which Avanir paid approximately $1,500 for each presentation. During this time, Dr. Raheja was the highest prescribing doctor and wrote approximately 10,088 Nuedexta prescriptions.

56.   According to CMS Open Payments, from 2014 to 2020, Avanir paid Dr. Idan Sharon ("Dr. Sharon") 329 times, resulting in more than $260,000. Upon information and belief, Dr. Sharon is one of Nuedexta's highest prescribing doctors. Plaintiff's assignor has paid for at least 30 claims for Nuedexta from Dr. Sharon, resulting in Plaintiff's assignors paying at least $12,512.05 for Nuedexta.

**THE NEUDEXTA ENTERPRISE**

57.   Avanir and the co-conspirators conducted or actively participated in conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Additionally, and in the alternative, Avanir and the co-conspirators, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Avanir's and the co-conspirators' actions (otherwise known as the

[4] Open Payments, https://openpaymentsdata.cms.gov/company/100000005729 (last visited Apr. 20, 2022).

CLASS ACTION COMPLAINT

"Neudexta Enterprise") were in furtherance of the enterprise and in violation of 18 U.S.C. § 1962(d).

58.    The Neudexta Enterprise participants include Avanir, the author-physicians who Avanir paid to produce the PRISM study, and the physicians who received kickbacks for prescribing Neudexta for off-label purposes. The Neudexta Enterprise is an association-in-fact between the Enterprise participants.

59.    The purpose of the Neudexta Enterprise was to conceal from the TPPs the off-label marketing of Neudexta and the amount of information the assignors received regarding claims for payment of Neudexta prescriptions so that the Neudexta Enterprise participants could profit in some manner. The author-physicians of the PRISM study and the physicians who prescribed Neudexta for off-label purposes, among others, profited from the various kickbacks. Although Avanir was the leader of the Neudexta Enterprise, each Neudexta Enterprise participant contributed to the purpose of concealing the off-label marketing of Neudexta and financial incentives received as a result of writing additional Neudexta prescriptions. Thus, each Neudexta Enterprise participant actively contributed and advised the other Neudexta Enterprise participants as part of the overall Enterprise.

60.    As alleged in detail above, Avanir and the Neudexta Enterprise used marketing and tactics, and Avanir and the co-conspirators executed these strategies to increase the sales of Neudexta throughout the United States, all while deceiving the TPPs.

## CLASS REPRESENTATION ALLEGATIONS

61.    Plaintiff seeks to represent a Nationwide Class pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) as defined below:

> All third-party payers in the United States and its territories and possessions that paid for Nuedexta from 2011 through the present that was manufactured, distributed, or sold by Defendant.

62.     The Nationwide Class has a Subclass:

> All third-party payers that paid for Nuedexta prescriptions written by Dr. Deepak Raheja from 2011 through the present that was manufactured, distributed, or sold by Defendant.

63.     Plaintiff alleges additional sub-classes for all TPPs in each State, territory, or possession—or combination(s) of States, territories, or possessions to the extent class members from these jurisdictions can be grouped together for purposes of class treatment—who, paid any amount of money out of pocket for Nuedexta that was manufactured, distributed, or sold by Defendant (collectively, the "Subclasses").

64.     Collectively, the foregoing Nationwide Class and the Subclasses are referred to as the "Class."

65.     Excluded from the Class are: (a) Defendant; (b) any parent, subsidiary, or affiliate of Defendant; (c) any entity in which Defendant has or had a controlling interest, or which the Defendant otherwise controls or controlled; and (d) any officer, director, employee, legal representative, predecessor, successor, or assign of Defendant.

66.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class.

67.     **Numerosity**: Joinder of all members is impracticable. Upon information and belief, the Class is comprised of hundreds TPPs, including commercial health plans, Medicare Advantage Organizations ("MAO"), first tier entities, down-stream entities, or their assignees throughout the United States of America and its territories, who paid for Nuedexta during the class period.

68.     **Existence and predominance of common questions of law and fact**: Questions of law and fact are common to all members of the Class. Specifically, Avanir's misconduct was directed at all Class Members and their affiliates. This is an action in which Plaintiff and the Class Members assert claims alleging the same theory of recovery,

namely that they have the right to recover damages for Avanir's unlawful scheme to increase Nuedexta prescriptions. Plaintiff and Class Members' claims arise from the same practice or course of conduct: Avanir intentionally misled TPPs on the use of Nuedexta, misled TPPs as to the prevalence of PBA, misled TPPs as to what PBA actually is, paid physicians to increase their prescriptions of Nuedexta to patients regardless of whether the patient actually suffered from PBA, and paid certain physicians to spread misinformation on Nuedexta and PBA. Thus, all Class Members have common questions of fact and law, i.e., whether Avanir illegally marketed Nuedexta and caused the Class Members to pay for prescriptions of Nuedexta that physicians otherwise would never have written. Each Class Member shares the same needed remedy: reimbursement. Plaintiff seeks to enforce its own rights, as well as the rights of the Class Members.

69. **Typicality**: Plaintiff's claims are typical of the Class Members' claims, as Avanir has damaged all in the same manner. Plaintiff's and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, share the same legal theory, and are not subject to any unique defenses. As the class representative, Plaintiff possesses the same interests and suffered the same injury as the other Class Members, which demonstrates a legally sufficient nexus between Plaintiff's claims and the Class Members' claims. Plaintiff's claims are typical of the Class Members' claims because Avanir targeted TPPs in its illegal scheme to increase prescriptions of Nuedexta and Plaintiff's assignors, like the Class Members, paid for an increased number of prescriptions for a drug the FDA approved to treat a rare condition, PBA.

70. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests in vindicating these claims are shared with all Class Members, and there are no conflicts between the named Plaintiff and the Class Members. Additionally, Plaintiff is represented by counsel who are competent and experienced in class action litigation and have no conflicts.

CLASS ACTION COMPLAINT

71.     The elements of Rule 23(b)(3) are met. Defendant has acted on grounds that apply generally to Class Members so that preliminary and/or final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

72.     **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this litigation because it is the most manageable and efficient way to resolve the individual claims of each Class Member. Specifically, a class action will provide Class Members with what may be their only economically viable remedy. Moreover, there are no known Class Members who are interested in individually controlling the prosecution of separate actions. Additionally, a class action will concentrate all litigation in one forum, which will conserve judicial and party resources with no unusual manageability problems.

73.     In the alternative, Plaintiff seeks to certify a national issues class under Rule 23(c)(4).

74.     Rule 23(c)(4) provides that an action may be brought or maintained as a class action with respect to particular issues when doing so would materially advance the litigation as a whole.

75.     In an effort to materially advance the litigation as a whole, pursuant to Rule 23(c)(4), Plaintiff brings this action on behalf of itself and the Class Members to resolve, *inter alia*, several important issues, including: whether Avanir intentionally misled TPPs on the use of Nuedexta, whether Avanir misled TPPs as to the prevalence of PBA, whether Avanir misled TPPs as to what PBA actually is, whether Avanir paid certain physicians to increase their prescriptions of Nuedexta to patients regardless of whether the patient actually suffered from PBA, and whether Avanir paid certain physicians to spread misinformation on Nuedexta and PBA, and whether Avanir illegally marketed Nuedexta and caused the Class Members to pay for prescriptions of Nuedexta that physicians otherwise would never have written.

**TOLLING**

76.    Plaintiff's assignors and the Class Members had no way of knowing about Avanir's illegal scheme to increase Nuedexta prescriptions.

77.    Avanir and the physicians it paid refused to disclose the true nature of their relationship regarding Nuedexta prescriptions.

78.    Within the applicable statutes of limitation, Plaintiff's assignors and the Class Members could not have discovered, through exercise of reasonable diligence, that Avanir was concealing the conduct complained of herein and misrepresenting its marketing practices, the illegal kickbacks, and the prevalence of PBA.

79.    Although Avanir and physicians reported payments on Medicare's Open Payment System, the true nature of the scheme went unreported, and Plaintiff's assignors and the Class Members had no way of knowing the true invidious nature of these payments.

80.    On September 24, 2019, a *qui tam* suit was unsealed. This suit, for the first time, explained how payments to physicians were being used as quid pro quo to increase Nuedexta sales to drive profits up to the detriment of Plaintiff's assignors and the Class Members.

81.    On September 26, 2019, the DOJ filed a criminal Information that demonstrated how Avanir was controlling the Nuedexta scheme.

82.    On October 2, 2019, through a Deferred Prosecution Agreement with the DOJ, Avanir, for the first time, admitted its role in the Nuedexta scheme. In this Agreement, Avanir admitted that its sales and marketing management sought to conceal communications from detection. In one exchange of messages, an Avanir executed instructed another executive to "make sure to delete your text messages." In that same exchange of messages, one executive asked if text messages are discoverable if deleted.

CLASS ACTION COMPLAINT

In a separate message exchange, one Avanir employee asked an Avanir executive to no longer send emails regarding the scheme.

83.    It was only in 2019 that the public (including Plaintiff's assignors and the Class Members) could have become aware of Avanir's scheme to increase prescriptions of Nuedexta. The unsealing of the *qui tam* complaint, along with the DOJ's criminal information against Avanir, was the first time that Avanir's Nuedexta scheme was revealed with first-hand accounts of how the scheme operated and how Avanir took steps to conceal its actions.

84.    Through this active concealment, and Avanir's repeated insistence of lacking any impropriety, Plaintiff's assignors, the Class Members, and any reasonable person, had no way of knowing the nature and prevalence of the Nuedexta scheme.

85.    Further, all documents that would lead a reasonable person to suspect that the Nuedexta scheme was ongoing, and is currently still ongoing, are in Avanir's exclusive custody and control.

86.    Plaintiff's assignors and the Class Members did not discover, and did not know of facts, that would have led a reasonable person to suspect that Avanir was engaged in an illegal scheme to increase Nuedexta prescriptions.

87.    Accordingly, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to all claims relating to Nuedexta.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)

88.    Plaintiff incorporates by reference paragraphs 1 to 87 as if fully stated herein.

89.    Avanir is a "person" within the meaning of 18 U.S.C. § 1961(3). Avanir conducted the affairs of the Nuedexta Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

90.     The Nuedexta Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Avanir, including its employees and agents, and the prescribers which it paid to increase their prescription volume of Nuedexta and induce other prescribers throughout the country to prescribe Nuedexta. All entities are persons within the meaning of 18 U.S.C. § 1961(3) and acted to enable Avanir to fraudulently market Nuedexta as a drug with more far-reaching potential than what was approved by the FDA.

91.     The Nuedexta Enterprise is an organization that functioned as an ongoing organization and continuing unit. The Nuedexta Enterprise was created and used as a tool to effectuate a pattern of racketeering activity. Each of these entities, including Avanir, is a "person" distinct from the Nuedexta Enterprise.

92.     Avanir, in concert with other participants in the Nuedexta Enterprise, created and maintained systematic links for a common purpose, to aid in marketing Nuedexta as an effective and safe alternative for treatment of conditions beyond PBA as well as broadening the definition of PBA beyond its accepted use in the medical community. Thus, the Nuedexta Enterprise improperly induced physicians to prescribe, and TPPs to pay for, Nuedexta. Each of the enterprise participants received substantial revenue from the fraudulent scheme to promote Nuedexta as safe and effective beyond its intended uses. The paid physicians, among others, profited from speaking fees, consulting fees, honoraria, and reimbursements. Such revenue was greater than it would have been if Avanir had properly marketed Nuedexta. All enterprise participants were aware of Avanir's control over the activities of the Nuedexta Enterprise in promoting Nuedexta. Furthermore, each portion of the enterprise benefited from the existence of the other parts.

93.     The Nuedexta Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, promoted, sold, or provided Nuedexta to thousands of individuals and entities throughout the United States.

CLASS ACTION COMPLAINT

94.     Avanir conducted and participated in the affairs of the Nuedexta Enterprise through patterns of racketeering activity, including acts indictable under 18 U.S.C. §§ 1341 (mail fraud); 1343 (wire fraud); and 1952 (use of interstate facilities to conduct unlawful activity).

95.     Avanir's fraudulent scheme consisted of, *inter alia*: (a) deliberately misrepresenting what PBA was and the rarity of PBA in the general population; (b) misrepresenting the effectiveness of Nuedexta for treatment of anything other than its FDA-approved use so that Plaintiff's assignors unnecessarily paid for Nuedexta to treat symptoms that were not scientifically proven to be safe and effective; and (c) actively concealing and causing others to conceal, information about PBA.

96.     Avanir's use of the mail and wires to perpetuate its fraud involved thousands of communications, including, but not limited to:

(a)     Communications with and among the Nuedexta Enterprise participants that misrepresented the safety and risks of Nuedexta and information related to PBA amongst themselves and others;

(b)     Communications with Plaintiff's assignors and the Class Members and/or their agents, inducing a lower placement of their respective drug formularies for Nuedexta by misrepresenting Nuedexta and PBA;

(c)     Communications with Plaintiff's assignors and the Class Members and/or their agents, inducing payments for Nuedexta by misrepresenting Nuedexta and PBA;

(d)     Receiving the proceeds in the course of and resulting from Avanir's improper scheme;

(e)     Transmittal and receipt of monies from Plaintiff's assignors or their agents; and

20

CLASS ACTION COMPLAINT

(f)     Transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the Nuedexta Enterprise.

97.    At all times during the fraudulent scheme, Avanir and the Enterprise participants had a legal and ethical obligation of candor to, and honest dealing with, public and private TPPs, physicians, and the medical community. Further, as the manufacturer of Nuedexta, it was unlawful for Avanir to promote Nuedexta for off-label use.

98.    The conduct of the Nuedexta Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Avanir's decisions and activities in connection with the Nuedexta Enterprise to routinely conduct their transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

99.    Plaintiff's assignors and the Class Members have been injured in their property by reason of these violations in that Plaintiff's assignors alone, paid over $5.2 million for Nuedexta, which would not have paid had Avanir not engaged in this pattern of racketeering activity.

100.    The injuries to Plaintiff's assignors and the Class Members were directly and proximately caused by Avanir's racketeering activity as Avanir knew health plans pay for prescription drugs.

101.    TPPs, including Plaintiff's assignors and Class Members, directly relied on the racketeering activities of Avanir and the Nuedexta Enterprise. This caused Plaintiff's assignors and the Class Members to place Nuedexta lower on their respective drug formularies. Avanir also purposely kept the cost of Nuedexta low to ensure it remained in a lower tier in Plaintiff's assignors' and the Class Members' formularies, thereby evading stricter scrutiny.

CLASS ACTION COMPLAINT

102.   By virtue of these violations of 18 U.S.C. § 1962(c), Avanir is liable to Plaintiff and the Class Members for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

103.   By reason of the foregoing, and as a direct and proximate result of Avanir's fraudulent misrepresentations, Plaintiff's assignors and the Class Members have suffered damages. Plaintiff and the Class is entitled to compensatory damages, punitive damages, costs and reasonable attorneys' fees.

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(d)

104.   Plaintiff incorporates by reference paragraphs 1 to 87 as if fully stated herein.

105.   Avanir and the Enterprise participants, as co-conspirators, violated 18 U.S.C. § 1962(d) by conspiring to violate section 1962(c). The object of the conspiracy was to participate in the conduct of the affairs of the Nuedexta Enterprise through a pattern of racketeering. Avanir conspired with prescribing physicians to promote Nuedexta by expanding the meaning of PBA, marketing its off-label use, and inducing physicians to prescribe Nuedexta without regard to a patient's actual diagnosis.

106.   Avanir and the other co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including inducing prescribers to increase their prescriptions of Nuedexta through a series of kickbacks.

107.   Avanir was aware that its fraudulent acts were part of an overall pattern of racketeering activity. Avanir knew that expanding the definition of PBA to physicians would lead to increased prescriptions of Nuedexta.

108.   As Avanir has already admitted, its sales executives intended for speaker fees to be used to induce prescribers to increase prescriptions of Nuedexta.

109.   In an exchange of messages, Avanir employees directly linked the increased speaker program funding to increasing prescriptions. For instance, a regional business

manager said that one method of increasing prescriptions of Nuedexta was to have educational programs for which a doctor would be paid.

110.   Avanir ranked its employees by the number of prescriptions written in their respective regions within a given year, which encouraged employees to compete against each other for speaker program funding to give to physicians in exchange for higher prescriptions.

111.   In another exchange of messages between a physician and an Avanir employee, the employee informed the prescriber that "[Avanir] ha[d] 20 programs scheduled for Q1, compared to 6 last year in Q1 . . . ." According to another Avanir employee, that same physician "said he will rx 20 [Nuedexta prescriptions] from now until the end of the month."

112.   Through the kickback scheme, Avanir paid this physician more than $330,000 in speaker fees and honoraria. As the highest prescriber of Nuedexta, this doctor alone wrote thousands of prescriptions.

113.   The nature of the co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

114.   As a direct and proximate result of Avanir's and the Enterprise's overt and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff's assignors and the Class Members have been injured in their property as set forth more fully above.

115.   Avanir sought and engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

CLASS ACTION COMPLAINT

(a)    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

(b)    Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

(c)    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and

(d)    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

116.   Plaintiff's assignors and the Class Members have been injured because of these violations. Plaintiff's assignors alone paid more than $5.1 million for Nuedexta prescriptions during the time of the Nuedexta Enterprise. Plaintiff's assignors would have paid for fewer Nuedexta prescriptions had Avanir not conspired to violate 18 U.S.C. § 1962(c).

117.   Avanir's racketeering activity directly and proximately caused injury to Plaintiff's assignors and the Class Members.

## COUNT III
## UNJUST ENRICHMENT

118.   Plaintiff incorporates by reference paragraphs 1 to 87 as if fully stated herein.

119.   Avanir marketed Nuedexta as an effective treatment for PBA and for off-label use.

120.   By expanding the use of Nuedexta and who may suffer from PBA, Avanir targeted TPPs, including Plaintiff's assignors, to pay for prescriptions that otherwise would never have been written.

121.   Plaintiff's assignors and the Class Members paid for Nuedexta during the unlawful scheme. Plaintiff's assignors alone paid, in total, $5.2 million for Nuedexta.

CLASS ACTION COMPLAINT

122.   Avanir has knowingly and intentionally benefitted, directly and indirectly, from the illegal kickback scheme with doctors throughout the country.

123.   Plaintiff's assignors and the Class Members have been damaged by paying for prescriptions that they otherwise would not have paid for but for Avanir's aggressive, illegal, and unfounded marketing campaign.

## COUNT IV

## FRAUD

124.   Plaintiff incorporates by reference paragraphs 1 to 87 as if fully stated herein.

125.   In its aggressive marketing push for Nuedexta, Avanir touted the PRISM study but knowingly omitted to prescribers that the study focused on the prevalence of PBA symptoms and not of the prevalence of PBA.

126.   In its marketing campaign, Avanir marketed Nuedexta for a variety of conditions unrelated to PBA and trained its sales representatives to aggressively promote an expanded, inaccurate, and intentionally misleading definition of PBA.

127.   In its marketing push, Avanir was illegally marketing off-label use of Nuedexta.

128.   As part of the scheme to increase prescriptions of Nuedexta, Avanir provided illegal kickbacks to physicians so that the physicians would increase the number of Nuedexta prescriptions they were writing, including for off-label use, and to spread misinformation about Nuedexta and PBA.

129.   In fact, Avanir has already admitted that one purpose of the Nuedexta scheme was to provide renumeration for the prescribing of Nuedexta.

130.   In communications between Avanir employees, an employee confirmed that one of Nuedexta's highest prescribing doctors agreed to continue prescribing Nuedexta in exchange for added speaker programs to be paid by the employee's commensurate fees. One message in the exchange stated: "[Physician] is fired up and committed. [Physician]

said he will rx 20 per day from now until the end of the month[,]" to which another Avanir employee responded, "[Physician]'s hungry so I'm accommodating an add' prgm for weds and I will sprinkle in a few others. . . ."

131.   Moreover, Avanir's sales executives intended for speaker fees to be used to induce prescribers to increase prescriptions of Nuedexta.

132.   To further perpetuate the fraud, Avanir knowingly represented false or misleading information about Nuedexta to keep Nuedexta in a lower tier in Plaintiff's and Class Members' formularies. Avanir did this to continue having Plaintiff's assignors and the Class Member pay for Nuedexta prescriptions and to avoid limitations that could restrict sales growth.

133.   Plaintiff's assignors and the Class Members relied on Avanir's false representations, directly and indirectly, and ultimately paid for the influx of Nuedexta prescriptions throughout the country.

134.   In total, Plaintiff's assignors alone paid over $5.2 million for Nuedexta prescriptions during the time of Avanir's scheme, which led to criminal indictments against doctors and former Avanir employees. Ultimately, a deferred prosecution agreement was reached between Avanir and the DOJ.

**COUNT V**

**CONSPIRACY TO COMMIT FRAUD**

135.   Plaintiff incorporates by reference paragraphs 1 to 87 as if fully stated herein.

136.   Avanir unlawfully engaged in a kickback scheme with certain prescribers to increase the volume of prescriptions for Nuedexta.

137.   Avanir paid the prescribers to induce Plaintiff's assignors and Class Members to pay for Nuedexta prescriptions that Plaintiff's assignors and Class Members would never have otherwise paid.

138.   Avanir induced the paid prescribers to prescribe Nuedexta for patients who did not have PBA and for patients whom Nuedexta would be ineffective in treating.

139.   Avanir and its paid prescribers also engaged in an effort to spread misinformation and induce other prescribers to also increase their volume of prescriptions for Nuedexta.

140.   As a result of Avanir's scheme, Plaintiff's assignors and the Class Members paid for Nuedexta throughout the term of Avanir's scheme. Plaintiff's assignors paid $5.2 million in total for Nuedexta.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class Members, pray for the following relief:

A.   An order that this action satisfies the prerequisites for maintenance of a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), and certify the respective Classes;

B.   An order designating Plaintiff as representative for the respective Classes and Plaintiff's undersigned counsel as Class Counsel for the respective Classes; and

C.   Judgement against defendant that:

    i.   Awards compensatory damages;

    ii.   Awards punitive damages;

    iii.   Awards costs of litigation, including reasonable attorneys' fees;

    iv.   Awards such other relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT

Dated:  May 20, 2022                    Respectfully submitted,

                              By:    */s/ Alex R. Straus*
                                     Alex R. Straus
                                     **MILBERG COLEMAN BRYSON**
                                     **PHILLIPS GROSSMAN, PLLC**
                                     280 S. Beverly Drive, PH Suite
                                     Beverly Hills, CA 90212
                                     Phone: (919) 600-5000
                                     astraus@milberg.com

                                     **RIVERO MESTRE LLP**
                                     2525 Ponce de Leon Blvd., Suite 1000
                                     Miami, Florida 33134
                                     Telephone: (305) 445-2500
                                     Facsimile: (305) 445-2505
                                     E-mail: amcgovern@riveromestre.com
                                     E-mail: ddaponte@riveromestre.com
                                     AMANDA MCGOVERN
                                     (*pro hac vice forthcoming*)
                                     Florida Bar No. 964263
                                     DAVID DAPONTE
                                     (*pro hac vice forthcoming*)
                                     Florida Bar No. 1002724

                                     **MSP RECOVERY LAW FIRM**
                                     *Attorneys for Plaintiff*
                                     2701 S Lejeune Road 10th Floor
                                     Coral Gables, Florida, 33134
                                     Phone: (305) 614-2222
                                     Serve:serve@msprecoverylawfirm.com
                                     Frank C. Quesada, Fla. Bar No. 29411
                                     (*pro hac vice forthcoming*)
                                     fquesada@msprecoverylawfirm.com
                                     John W. Cleary, Fla. Bar No. 118137
                                     *pro hac vice forthcoming*
                                     jcleary@msprecoverylawfirm.com

28

CLASS ACTION COMPLAINT

**ARMAS BERTRAN ZINCONE**
*Attorneys for Plaintiff*
4960 SW 72 Avenue, Ste. 206
Miami, Florida 33155
Eduardo E. Bertran, FBN: 94087
*(pro hac vice forthcoming)*
ebertran@armaslaw.com
Phone: 305-661-2021

CLASS ACTION COMPLAINT