Amanda McGovern (*pro hac vice*)
amcgovern@riveromestre.com
David DaPonte (*pro hac vice*)
ddaponte@riveromestre.com
**RIVERO MESTRE LLP**
2525 Ponce de Leon Blvd., Suite 1000
Miami, FL 33134
Telephone: (305) 445-2500
Facsimile: (305) 445-2505

Eduardo E. Bertran (*pro hac vice*)
ebertran@armaslaw.com
**ARMAS BETRAN ZINCONE**
4960 SW 72 Avenue, Ste. 206
Miami, Florida 33155
Phone: (305) 661-2021

John W. Cleary (*pro hac vice*)
jcleary@msprecoverylawfirm.com
**MSP RECOVERY LAW FIRM**
2701 S Lejeune Road 10th Floor
Coral Gables, Florida, 33134
Phone: (305) 614-2222

Alex R. Straus, Cal. Bar No. 321366
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Phone: (919) 600-5000
astraus@milberg.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware entity; and MSP Recovery Claims Series 44, LLC<br><br>    Plaintiff,<br><br>v.<br><br>AVANIR PHARMACEUTICALS, INC.,<br><br>    Defendant. | Case No. 8:22-cv-01026<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs, MSP Recovery Claims, Series LLC, ("MSPRC") and MSP Recovery Claims Series 44, LLC ("Series 44") (collectively, "Plaintiffs"), on behalf of themselves and of a Class of similarly situated third-party payers ("TPPs"), brings this action against Defendant Avanir Pharmaceuticals, Inc., ("Avanir") and state the following:

## I.   <u>NATURE OF THE ACTION</u>

1.   Avanir manufactures, markets, and sells a drug product containing dextromethorphan hydrobromide and quinidine sulfate, which markets under the trade name Nuedexta ("Nuedexta").

2.   The U.S. Food and Drug Administration ("FDA") approved Nuedexta for one use—the treatment of pseudobulbar affect ("PBA")—an extremely rare condition affecting 0.5% to 2% of Americans characterized by episodes of sudden and uncontrollable laughing or crying that do not reflect a person's actual emotions.

3.   While the FDA approved Nuedexta for the treatment of PBA arising from multiple sclerosis ("MS") and amyotrophic lateral sclerosis ("ALS"), it did not approve prescribing Nuedexta for patients with other types of emotional liability than can commonly occur in patients with Alzheimer's disease and other dementias.

4.   Despite the FDA's limited approval, in an effort to dramatically increase Nuedexta sales and guarantee coverage for such prescriptions, Avanir aggressively marketed and promoted Nuedexta and encouraged prescribers to inaccurately label large numbers of their patients as having PBA based in part on Avanir's mischaracterization of the condition and exaggerated prevalence estimates.

5.   In marketing Nuedexta, Avanir broadly redefined PBA and trained its sales representatives to promote an expanded and amorphous definition of the condition, which encompasses a wide variety of common neurological conditions and behaviors that have no link to PBA. Avanir promoted its own ever-expanding figures for the prevalence of

2

PBA, which have steadily grown over roughly the last dozen years from 880,000 patients with PBA to as many as 7.1 million.

6.      As part of this effort, Avanir funded a "study" (known as the "PRISM study") linking Nuedexta to a decrease in PBA-like symptoms in patients. Four of the five doctors who authored the study were paid by Avanir, and the other author was an Avanir employee. Avanir used the study to further its scheme to promote and market Nuedexta beyond actual PBA diagnoses, in turn driving up Nuedexta's sales.

7.      Further, Avanir promotes Nuedexta as a treatment for several relatively common off-label conditions, such as agitation with Alzheimer's disease, depression and autism.

8.      But that's not all. Avanir provided illegal kickbacks by offering and providing illegal remuneration to physicians and other health care providers, in the form of cash, travel and meals as an inducement to prescribe Nuedexta to patients for off-label uses. In particular, Avanir's decision as to which health care providers would receive speaker fees and volume of those fees was based on the volume of the professional's Nuedexta prescriptions or the professional's ability to generate Nuedexta prescriptions through other fraudulent claims to Medicare and Medicaid.

9.      Avanir has made false and misleading statements about Nuedexta through:

    a.      Avanir's salespersons during visits to physician offices and long-term care facilities;

    b.      promotional materials referenced and distributed by Avanir salespersons at meetings of professional associations and at company-sponsored programs;

    c.      dinner and speaker programs that were scheduled, designed, promoted and controlled by Avanir;

    d.      websites and videos targeted at health care providers; and

e. websites, videos and other promotional material used in direct-to-consumer marketing of Nuedexta.

10. Avanir's conduct led to the U.S. Department of Justice (the "DOJ") filing a criminal action against it. Avanir ultimately agreed to enter into a Deferred Prosecution Agreement ("DPA"), whereby Avanir admitted its scheme. Specifically, Avanir stipulated to paying Dr. Deepak Raheja ("Dr. Raheja"), hundreds of thousands of dollars in speaker fees and honoraria to induce Dr. Raheja to become a high prescriber of Nuedexta to Plaintiffs' Assignors' Enrollees. The DPA is attached as **Exhibit A**.

11. As part of the DPA, Avanir agreed to pay the United States more than $12 million in monetary penalties and criminal forfeiture.

12. Further, in September 2019, Avanir reached a civil settlement with the United States resolving False Claims Act claims related to Nuedexta. The settlement agreement provides that the United States contends it has claims against Avanir based on the following conduct:

a. Avanir provided remuneration in the form of money, honoraria, travel, and food to physicians and other health care professionals to induce those health care professionals to write prescriptions for Nuedexta. One form of renumeration included Avanir's payment to certain health care professionals to give speaker programs about Nuedexta based on the willingness of the health care professionals to prescribe Nuedexta.

b. Avanir implemented a strategy to market Nuedexta to health care professionals treating patients in long-term care facilities for uses other than PBA. Non-PBA uses are not FDA approved and are not medically accepted indications as defined by the statutes and regulations governing the Federal health care programs.

To resolve these claims, Avanir agreed to pay the United States more than $95 million.

4

13.     Plaintiffs' Assignors, who provide benefits under Medicare Parts C and D, and the TPP Class Members, were the ultimate targets and victims of Avanir's scheme. Patient accessibility to Nuedexta was a central part of Avanir's unlawful scheme.

14.     Through its scheme, Avanir induced Plaintiffs' Assignors and the Class Members to include Nuedexta in their formularies largely without any prior authorizations or restrictions. Further, Avanir kept the price of Nuedexta lower than it otherwise would have to ensure the drug was predominately paid by the TPPs like Plaintiffs' Assignors and the Class Members.

15.     Avanir caused Plaintiffs' Assignors and the TPP Class Members to pay for Nuedexta for not-medically-indicated and not-medically-necessary Nuedexta prescriptions for patients who did not have symptoms consistent with PBA and had no prior PBA diagnosis. Nuedexta prescribed in these non-PBA contexts failed to meet the definition of a Medicare Part D drug because non-PBA uses are not medically accepted indications and are not medically necessary. The chart below demonstrates examples of the amounts paid by Plaintiffs' Assignors:

| Assignor | Amount Paid |
|---|---|
| Summacare | $ 27,139.03 |
| Network Health | $ 107,020.18 |
| Connecticare | $ 104,401.76 |
| Emblem | $ 423,505.60 |
| Fallon Community Health | $ 54,999.97 |
| Health First | $ 18,962.39 |

16.     Further, Avanir's kickbacks to the prescribers, in violation of federal law, cause those prescribers' respective prescriptions to be tainted by fraud. Accordingly, those prescriptions were ineligible for payment under the applicable federal regulations.

## II.     <u>JURISDICTION AND VENUE</u>

17.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for each of the non-federal claims.

18.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because at least one member of the class is a citizen of a different state than the Defendant and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

19.     This Court has personal jurisdiction over Defendant because it is (i) authorized and licensed to conduct business in California, (ii) has its principal place of business in this judicial district, (iii) maintains and carries on systematic and continuous contacts in this judicial district, (iv) regularly transacts business within this judicial district, and (v) regularly avails itself of the benefits of this judicial district.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2).

## III.     <u>THE PARTIES</u>

### A.     PLAINTIFFS

21.     Plaintiffs are companies that have obtained irrevocable assignments of any and all rights to recover reimbursement or payment from Defendant. Plaintiffs' Assignors provide health insurance coverage, pursuant to Medicare Part C and Part D, Medicaid, and commercial contracts for insurance, to persons that subscribe to their plans (the "Enrollees").

### MSPRC

22.     MSP Recovery Claims, Series LLC ("MSPRC") is a Delaware series limited liability company with its principal place of business at 2701 S. Lejeune Road, 10th Floor,

6

Coral Gables, Florida 33134. MSPRC's limited liability company agreement provides for the establishment of one or more designated series.

23.    MSPRC has established various designated series pursuant to Delaware law to maintain various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series. Pursuant to MSPRC's limited liability agreement, all designated series form a part of MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name or it may elect to bring suit in the name of its designated series.

24.    Certain series of MSPRC have executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' health plan members and Enrollees. These assignments authorize the series and, in turn MSPRC through its operating agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits. For example, and to further demonstrate standing, MSPRC alleges a few of the assignments below:

25.    On May 12, 2017, one of the Assignors, Summacare, Inc. ("Summacare") irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendant) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC ("MSP Recovery"). The assignment expressly provides:

> [Summacare] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [Summacare's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any

7

and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [Summacare] that [Summacare] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [Summacare] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

26.    On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the Summacare Assignment to Series 16-11-509, a designated series of MSPRC:

[Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among [Summacare] . . . and [MSP Recovery] . . . .

27.    Summacare consented to, acknowledged, approved, and ratified the assignment from MSP Recovery to Series 16-11-509, which is memorialized in a letter dated September 5, 2018.

28.    On August 9, 2017, Network Health, Inc. ("NHPN") irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendant) for payments made on behalf of its Enrollees pursuant to Medicare law to MSP Recovery, LLC. Specifically, the NHPN assignment states:

[NHPN] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [NHPN's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [NHPN] that [NHPN] had, may have had, or

8

has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [NHPN] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

29.    On August 10, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the NHPN assignment to Series 15-09-355, LLC, a designated series of Plaintiff MSP Recovery Claims, Series LLC. The Series assignment specifically states:

[Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated August 9, 2017, by and among [NHPN] and [MSP Recovery, LLC] . . .

30.    On June 19, 2017, **Fallon Community Health Plan** ("FCHP") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to MSP Recovery, LLC. Specifically, the FCHP Assignment states the following:

[FCHP] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [FCHP's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [FCHP] that [FCHP] had, may have had, or has asserted against any party in connection with Claims and all rights and claims against primary payers and/or third parties that may be liable to [FCHP] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

9

FCHP Assignment at 4.1.

31.  On June 20, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the FCHP Assignment to Series 17-04-631, LLC, a designated series of Plaintiff MSP Recovery Claims, Series LLC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated June 19, 2017, by and among [FCHP] and MSP Recovery, LLC . . .

Consideration was given between the parties in executing these agreements.

32.  On March 20, 2018, **Group Health Incorporated and Health Insurance Plan of Greater New York** ("Emblem") irrevocably assigned all rights to recover against any liable entity (including defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to Series 16-08-483, a designated series of Plaintiff MSP Recovery Claims, Series LLC and to MSP Recovery, LLC ("Emblem Assignment"). The Emblem assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable…

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

33.    The "Medicare Recovery Claims" assigned to Plaintiff MSP Recovery Claims, Series LLC include Emblem's "legal and equitable rights to seek reimbursement and/or recover payments from primary payers . . . responsible to [Emblem] directly or through rights conferred on [Emblem] pursuant to state and/or federal law pertaining to beneficiaries, for Health Care Services provided to [Emblem's] Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by [Emblem] . . . pursuant to a Medicare Advantage Plan[.]" *Id.* at p. 1.

34.    The "Assigned Medicare Recovery Claims" included the above-referenced Medicare Recovery Claims but excluded "Medicare Recovery Claims that [could] be asserted against Assignor's members, enrollees and/or contracted providers" and Medicare Recovery Claims that as of March 20, 2018 (the Effective Date of the agreement) had been assigned to and/or were being pursued "by other recovery vendors" for services rendered within a defined six-year time period. *Id*. These excluded claims are defined in the Emblem Assignment as "Assignor Retained Claims." *Id*.

35.    On April 4, 2018, MSP Recovery, LLC assigned the rights it had acquired in the Emblem Assignment to Series 16-08-483, a designated series of Plaintiff MSP Recovery Claims, Series LLC ("Series Assignment"). The Series Assignment from MSP Recovery, LLC to Series 16-08-483, which was ratified and approved by Emblem, states:

> MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of ... and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, **Series 16-08-483, a designated series of**

11

> **MSP Recovery Claims, Series LLC,** a Delaware Series Limited Liability Company, and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets" "Assigned Medicare Recovery Claims" and "Assigned Documents" (and all proceeds and products thereof) as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

(Emphasis original). Consideration was given between the parties in executing this assignment.

36. On March 20, 2018, **ConnectiCare, Inc.** ("ConnectiCare") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to Series 15-09-157, a designated series of Plaintiff MSP Recovery Claims, Series LLC and to MSP Recovery, LLC, a Florida Limited Liability Company. Specifically, the ConnectiCare Assignment states the following:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

12

ConnectiCare Assignment at 2.

37.     On April 4, 2018, MSP Recovery, LLC assigned the rights it acquired in the ConnectiCare Assignment to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC ("Series Assignment"). The Series Assignment from MSP Recovery, LLC to Series 15-09-157, which was ratified and approved by ConnectiCare, Inc., states:

> MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of . . . and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to **Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC** . . . ("Assignee"), and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all assigned Subject Medicare Recovery Claims, . . . as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

Consideration was given between the parties in executing these agreements.

**Series 44**

38.     MSP Recovery Claims Series 44, LLC ("Series 44") is a duly organized and existing Delaware series limited liability company with its principal place of business in Coral Gables, Florida. Series 44's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Series 44 established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series.

39.     Series 44 has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Series 44. Series 44 may receive assignments in the name of Series 44 and

13

further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Series 44 and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Series 44 retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

40.     Effective April 28, 2016, **Health First Health Plans, Inc.** ("HFHP"), a Medicare Advantage organization, irrevocably assigned all rights to recover payments made on behalf of its Enrollees to MSP Recovery (the "HFHP Assignment"). The HFHP Assignment expressly provides, in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto . . . all of which shall constitute the "Assigned Claims."
>
> …
>
> The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

14

HFHP Assignment.[1]

41.   Effective June 12, 2017, MSP Recovery assigned all rights acquired under the HFHP Assignment to Series 16-05-456, a designated series of MSPRC (the "Series Assignment"). The Series Assignment states:

> [T]he undersigned Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the Claims and Assigned Claims, (and all proceeds and products thereof, including any related assigned assets and assigned documents) as such terms are defined or contained in that certain (1) Assignment and (2) Addendum to the Recovery Agreement and Assignment Addendum, both given and effective April 28, 2016 and executed on June 1, 2018, by and between Health First Health Plans, Inc., a Florida corporation and Medicare Advantage Organization and party to contract number H1099 with The Centers for Medicare & Medicaid Services, as the "Client" and health plan assignor, and [MSP Recovery], a Florida limited liability company (the "Assignment"); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment from the Client, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all

---

[1] The agreements entered between MSP Recovery, Health First Administrative Plans, and Health First Health Plans have been the subject of much litigation over the last three years. However, the Eleventh Circuit Court of Appeals in *MSP Recovery Claims*, *Series LLC v. QBE Holdings*, *Inc.*, 965 F. 3d 1210 (11th Cir. 2020) held that the document referenced in paragraph 40 properly assigned the claims and is the relevant document that provided MSP standing to assert HFHP's recovery rights.

information relating thereto.

42.     Further, on October 22, 2020, Series 16-05-456 entered into an assignment agreement with to Series 44-20-456, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery. This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

> [Series 16-05-456] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-456] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the [claims], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims" ) as such terms are defined in the Agreements.

43.     This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HFHP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HFHP arising from or relating to the Claims and all information relating thereto.

44.     Consideration was given between each party in executing these assignments.

## B.     DEFENDANT

45.     Defendant Avanir is a biopharmaceutical incorporated in Delaware with its principal place of business at 30 Enterprise, Suite 200, Aliso Viejo, California 92656.

## IV.   <u>FACTUAL ALLEGATIONS</u>

### A.   NUEDEXTA, A DRUG APPROVED BY THE FDA TO TREAT PSEUDOBULAR AFFECT, A RARE NEUROLOGICAL DISORDER

46.     Pseudobulbar affect is a condition characterized by episodes of sudden and uncontrollable laughing or crying that is not indicative of a person's actual emotional state.[2] PBA is the resulting cause of a neurological disease, including a stroke, dementia, traumatic brain injury, and Parkinson's disease.[3]

47.     PBA is rare.  It is estimated that only 0.5% to 2% of Americans suffer from PBA.[4]

48.     There is no cure for PBA. To address PBA, doctors prescribe treatments to manage PBA's symptoms to improve the patient's quality of life. PBA is managed through regular, recurring treatments over the course of a patient's life.

49.     Pharmacological treatment for PBA is not appropriate for all patients with this condition. As such, treatment for PBA is equally targeted to the underlying disease that gave rise to PBA, as opposed to pharmacological treatment of PBA alone i.e., dementia drugs.

### B.   NUEDEXTA'S LIMITED FDA APPROVAL

---

[2]   *Pseudobulbar Affect*, Nat'l Center for Advancing Translational Sciences, https://rarediseases.info.nih.gov/diseases/12012/pseudobulbar-affect#ref_7191(last visited Apr. 20, 2022).

[3]   *Pseudobulbar Affect Infographic*, Am. Stroke Ass'n, https://www.stroke.org/en/help-and-support/support-group-leader-resources/lesson-modules/pseudobulbar-affect/pseudobulbar-affect-infographic (last visited Apr. 20, 2022).

[4]       *Pseudobulbar Affect (PBA)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/17928-pseudobulbar-affect-pba (last visited Apr. 20, 2022).

50.     In October 2010, the FDA approved the drug Nuedexta for a single use: treatment of PBA. At that time, and at all relevant times thereafter, Avanir's primary marketed product was Nuedexta.

51.     Avanir commercially launched Nuedexta to the public in February 2011. Avanir currently has patent exclusivity over Nuedexta until 2026.

52.     The FDA's approval for Nuedexta for PBA was limited to patients with a PBA diagnosis arising from MS or ALS. The FDA did not approve—and the prescription label warned against—prescribing Nuedexta for patients with other types of emotional liability than can commonly occur in patients with Alzheimer's disease and other dementias.

### 1.   The FDA Expresses Concerns About Nuedexta's Safety and Efficacy and the Clinical Trials Conducted by Avanir

53.     On January 27, 2006, Avanir completed the submission of the New Drug Application ("NDA") seeking marketing approval of Nuedexta[5] to the FDA's Center for Drug Evaluation for Drug and Research ("CDER").

54.     The FDA's primary clinical reviewer of the NDA found that Avanir's studies failed to establish the safety and efficacy of Nuedexta for the treatment of PBA. In addition, the Director of CDER's Division of Neurology Products—the ultimate decision maker on the Nuedexta NDA—noted that there were serious concerns about the safety of Nuedexta in vulnerable populations that has not been adequately studied.

55.     In a letter dated October 30, 2006 and at a follow up meeting in February 2007, the FDA informed Avanir that it would not approve Nuedexta for PBA because of concerns about the drug's safety and efficacy—namely, there was only limited evidence of Nuedexta in patients with Alzheimer's disease, stroke and TBI. Individuals with these conditions were included in an open-label study, but not in the controlled trails, and as

---

[5] Avanir previously referred to Nuedexta as AVP-923, Neurodex and Zenvia.

cited by the FDA's clinical reviewer, the U.S. prevalence of individuals with these conditions is about 100 times greater than the prevalence of ALS and about 10 times greater than the prevalence of MS.

### 2. Avanir Reformulates Nuedexta but Concerns Remain

56.     To address the FDA's safety concerns, Avanir proposed two new formulations of Nuedexta, one with 30 mg of dextromethorphan ("DM") and one with 20 mg of DM, both with 10 mg of Quinidine (the original formulation utilized 30 mg of both components). The FDA requested that Avanir provide additional clinical data to demonstrate that these new formulations would be effective and enhance safety.

57.     In response, Avanir undertook a new, twelve-week Phase III clinical trial, which involved subjects with ALS and MS and involved two alternative dosage formulations of Nuedexta.

58.     After reviewing the results of the Clinical III study and the NDA, the FDA's primary clinical reviewer still had concerns about the safety of PBA in individuals with conditions other than MS and ALS, which had not been adequately studied.[6]

59.     Among other concerns, the FDA's Cross Discipline Team Leader Review ("CDTL Review") stated that "***evidence that Nuedexta is effective in all conditions in which PBA occurs is quite weak***."

60.     Thus, both reviewers believed Nuedexta should only be approved for the treatment of PBA in patients with MS and ALS.

61.     The CDTL Review expressed further concerns about approving Nuedexta for PBA in individuals with conditions other than ALS or MS, stating:

> [Avanir] is making the argument that the name "PBA" does not include, for example, patients with disordered affect resulting from [Alzheimer's disease]. Thus, **they defend the appropriateness of a "global" claim in PBA by defining PBA**

---

[6] Avanir has not conducted any controlled studies involving individuals with diseases other than ALS or MS.

19

**narrowly**, as occurring mainly in MS, ALS, stroke and traumatic brain injury (TBI).

. . . .

However, while [Avanir] claims in their Complete Response that PBA is a condition limited to MS, ALS, stroke, TBI, and "a number of other neurological conditions" . . . [Avanir] nearly simultaneously co-authored a paper reporting the results of [its additional Phase III trial] (Pioro et al., Ann Neurol 2010) that contained an introduction that explicitly defines PBA as including [Alzheimer's Disease].

62.     While the CDER Director concluded that Nuedexta could reasonably be assumed safe and efficacious in treating "PBA that occurs in other neurologic conditions not studied in controlled trials," he endorsed the concerns of the other FDA reviewers, and concluded:

[The reviewers were] rightly concerned that there are behavioral changes seen in patients with Alzheimer's Disease (AD) that may mimic PBA, and that **it is unclear that PBA actually occurs in patients with [Alzheimer's disease]**, although [Avanir] clearly believes it does, and we have reason to expect that [Avanir] would wish to promote Nuedexta's use in patients with Alzheimer's disease]. **I believe that labeling can be written that can make clear that PBA is a distinct syndrome, and that Nuedexta has not been shown to be safe and effective for any other behavioral abnormalities that might occur in the setting of other neurologic diseases.**

## C.     OTSUKA PHARMACEUTICALS JOINS THE SCHEME TO INCREASE NUEDEXTA PRESCRIPTIONS

63.     In December 2014, Otsuka Pharmaceutical Co., Ltd.'s ("Otsuka Pharmaceutical") announced the acquisition of Avanir through a $3.5 billion all-cash tender offer. On January 13, 2015, the transaction closed, making Avanir a wholly owned

subsidiary of Otsuka America, Inc. ("Otsuka America"). Otsuka America is a subsidiary of Otsuka Pharmaceutical.

64.     Prior to the acquisition, Avanir was comprised of approximately 500 employees. Of those 500 employees, 330 were pharmaceutical sales representatives who were tasked with promoting Nuedexta, which, at the time, was Avanir's only FDA approved prescription drug.

65.     However, in announcing the Otsuka acquisition, Avanir stated that one implication of the transaction was the addition of 300 Otsuka psychiatry sales representatives to the Nuedexta sales effort, which would result in "[m]ore noise, more adoption, [and] more patients being helped!"[7]

66.     During a company-wide presentation on March 11, 2015, at Avanir's National Sales Meeting, Eric Benevich (Avanir's Vice President for Marketing) announced Otsuka's reinforcement initiative. The following week, Otsuka's sales representatives were trained on the misinformation about Nuedexta by Avanir employees, using Avanir training material. Shortly thereafter, Otsuka representatives were peddling misinformation and kickbacks alongside Otsuka's Avanir counterparts.

## D.     NUEDEXTA COVERAGE UNDER MEDICARE AND MEDICAID

67.     For a drug to qualify for Medicare Part D reimbursement, the Medicare Prescription Drug Benefit Manual requires that the drug be provided only for "medically accepted indications."[8]

---

[7] Avanir Pharm., Inc., Solicitation/Recommendation Statement (Schedule 14D-9) (Dec. 2, 2014).

[8] *See* Medicare Prescription Drug Benefit Man., Ch. 6, § 10.1 (to be a part D drug, a drug must be used for a medically-accepted indication as defined by 42 U.S.C. § 1396r-8(k)(6)); *see also* 42 U.S.C. § 1395w-102(e) (defining covered part D drug).

68.     A medically accepted indication includes FDA approved uses or off-label uses supported by one or more of three compendia specified in Section 1927(g)(1)(B) of the Social Security Act.

69.     None of the compendia listed any approved off-label uses for Nuedexta.

70.     Nuedexta qualified for Medicare Part D reimbursement only when provided for its FDA-approved use—the treatment of PBA.

71.     Payments for Part D drugs that are not for medically accepted indications are considered potential fraud or abuse.[9]

72.     Medical providers, such as physicians or medical practices, enter into provider agreements to establish their eligibility to participate in the program. To be eligible for payment under the program, physicians or a practice must make certain certifications, including agreeing to abide by Medicare laws and regulations and acknowledging that payment by Medicare is conditioned upon the claim and the underlying transaction comply with such laws.

73.     Avanir caused physicians to write and submit claims for not-medically-indicated and not-medically-necessary Nuedexta prescriptions for patients who did not have symptoms consistent with PBA and had no prior PBA diagnosis.

74.     Nuedexta prescribed in these non-PBA contexts failed to meet the definition of a Medicare Part D drug because non-PBA uses are not medically accepted indications and are not medically necessary.

**E.     AVANIR'S     ILLEGAL     AND     FRAUDULENT     MARKETING PRACTICES**

---

[9] *See* U.S. Dep't of Health & Hum. Ser. Office of Inspector Gen., Office of Evaluation & Inspections, Memorandum Report: Ensuring That Medicare Part D Reimbursement is Limited to Drugs Provided for Medically Accepted Indications, OEI-07-08-00152 (2011) at 2.

75.     Despite the low prevalence of PBA among the general population, Avanir aggressively marketed Nuedexta and shoved it into the market by any means necessary, including broadening the scope of what Nuedexta can treat and redefining what PBA is to the medical community, i.e., marketing non-PBA symptoms as PBA.

### 1.  Avanir's Inflation of PBA Prevalence Estimates

76.     Around 2001, Avanir believed that "emotional liability" affected "[a]pproximately one million patients per year."[10] Avanir did not refer to the condition Nuedexta was intended to treat as PBA until around 2005 "[t]he medical literature indicates that there are approximately ***800,000 to 1,000,000 patients*** who have PBA in North America."[11]

77.     In 2005, Avanir significantly increased its spending on sales and marketing, with a $6.4 million increase over the prior fiscal year attributable to, among other things, "[t]he continued expansion of our ***medical education and awareness programs for PBA***."[12]

78.     By the end of 2006, Avanir increased its own public estimates of PBA's prevalence, stating that "[w]hile the exact number is unknown, based on our review of medical literature, independent surveys and our latest market research, we believe that there are likely ***over one million patients*** in the U.S. suffering from the symptoms of IEED/PBA.[13]

79.     By 2010, Avanir had more than doubled its PBA prevalence estimate and introduced the altogether novel idea that many patients suffer from ***mild*** forms of PBA,

---

[10] Avanir Pharm., Inc., Annual Report (Form 10-K) 5 (Dec. 21, 2001).
[11] Avanir Pharm., Inc., Annual Report (Form 10-K) 1 (Dec. 14, 2005) (emphasis added).
[12] *Id.* at 26 (emphasis added).
[13] Avanir Pharm., Inc., Annual Report (Form 10-K) 3 (Dec. 18, 2006) (emphasis added).

23

surmising that "[w]e estimate that between *1.8 and 2.0 million people* in the United States suffer from *moderate to severe PBA*, with many more suffering from *mild* PBA."[14]

80.     Since 2013, Avanir has directed its sales representatives to distribute summaries of an Avanir funded and generated article—"PRISM: A Novel Research Tool to Assess the Prevalence of Pseudobulbar Affect Symptoms Across Neurological Conditions" (the "PRISM study").[15] Although the PRISM study was published by a group of five doctors, a closer inspection reveals that each of these doctors received separate funding from Avanir for the study, and one of the doctors was an Avanir employee.

81.     Avanir directed its sales representatives to distribute summaries of the PRISM study and promote PRISM's inflated prevalence estimates to physicians, other health care providers and insurers. In particular, Avanir taught its sales representatives to convey the following PBA prevalence estimates for patients with six different neurological disorders, which appear in the PRISM article: (1) amyotrophic lateral sclerosis (44.8%); (2) multiple sclerosis (45.8%); (3) traumatic brain injury (52.4%); (4) stroke (37.8%); (5) Parkinson's disease (26.0%); and Alzheimer's disease (29.3%).

82.     While the PRISM study draws conclusions regarding "PBA *symptom* prevalence," rather than actual PBA prevalence, Avanir trained its sales representatives to ignore this distinction and present PRISM as providing prevalence estimates. Thus, Avanir, through its sales representatives, used the PRISM study to promote Nuedexta as a treatment for *symptoms of PBA* and not PBA itself.

---

[14] Avanir Pharm., Inc., Prospectus Supplement (Form 424(b)(5)) S-2 (Nov. 16, 2010) (emphasis added).

[15] Benjamin R. Brooks et al., *PRISM: A Novel Research Tool to Assess the Prevalence of Pseudobulbar Affect Symptoms Across Neurologic Conditions*, 8 PLOS One 8 (Aug. 21, 2013), https://doi.org/10.1371/journal.pone.0072232.

FIRST AMENDED COMPLAINT / CASE NO. 8:22-cv-01026

83.    Avanir would reprint the inflated prevalence estimates which far exceeded the company's previous PBA prevalence claims[16], in various promotional materials that its sales representatives would distribute to physicians and other health care providers.

84.    Avanir played a central role in generating the PRISM study and its prevalence estimates. For example, the study credits Avanir with funding the study and providing "editorial support for manuscript preparation." Likewise, it identifies Avanir's former Chief Medical Officer and current Senior Vice President of Medical Affairs, Randall Kaye, as an author and credits him with (at least partially) conceiving and designing the underlying experiments, analyzing the study data, and writing the article itself.

85.    By redefining PBA to include other diagnoses and unfoundedly touting its increased prevalence, Avanir was broadening the market of people who would be eligible for Nuedexta. Because PBA is secondary to an underlying neurological disorder, Avanir began marketing Nuedexta for patients with disorders more common than PBA, including Alzheimer's and dementia. Most patients with Alzheimer's and dementia tend to be 65 years old and older whom Medicare provides with health and prescription drug insurance.

86.    In Avanir's final 10-K filing, Avanir estimated about 2 million people in the U.S. have "moderate to severe PBA symptoms, with many more suffering from mild PBA symptoms."[17]

87.    Thus, Avanir has steadily increased its PBA prevalence claims from less than one million people in the United States to well over two million. Through a series of

---

[16] In fact, pursuant to the PRISM study's estimates and assuming no overlap between the categories, the number of people with purported PBA equals 2,126,000 among the nation's estimated 5.3 million Alzheimer's disease patients, 1.5 million Parkinson's disease patients, and 400,000 multiple sclerosis patients. Thus, before considering the millions of people with lingering neurological problems from strokes and traumatic brain injuries or amyotrophic lateral sclerosis patients, the PRISM prevalence estimates easily exceed Avanir's prior estimates.

[17] Avanir Pharm., Inc., Annual Report (Form 10-K) (Dec. 10, 2014).

25

articles sponsored, commissioned, and in some instances, effectively authored by Avanir (such as the PRISM study), Avanir developed a biased body of authority that it used to support and promote its own inflated prevalence claims.

88.     Avanir has sought to inflate the purported prevalence of PBA to create the expectation among health care providers that a large portion of their patients with certain neurological disorders are also suffering from PBA.

### 2. Avanir's Marketing of Nuedexta for Specific Off-label Indications

89.     Avanir induced doctors to prescribe Nuedexta to more patients through kickbacks and fraudulent marketing.

90.     Plaintiffs' Assignors and the TPP Class Members were the intended victims of the kickback scheme because they had to pay for the influx of prescriptions for Nuedexta.

91.     Nuedexta has been approved by the FDA to treat a single condition, PBA, and Avanir is prohibited from promoting the drug as a treatment for any other condition such as depression, agitation associated with dementia or Alzheimer's disease, sundowners, autism or MS pain.

92.     Indeed, from October 2010 until January 2015, Nuedexta's FDA-approved label referenced the limited indication:

> NUEDEXTA is . . . indicated for the treatment of pseudobulbar affect (PBA). Studies to support the effectiveness of NUEDEXTA were performed in patients with underlying amyotrophic lateral sclerosis (ALS) or multiple sclerosis (MS). **NUEDEXTA has not been shown to be safe or effective in other types of emotional ability that can commonly occur, for example, in Alzheimer's disease and other dementias.**

93.     Avanir was aware of the prohibitions on off-label marketing as conceded in its Annual Report (Form 10-K) to shareholders for the 2014 fiscal year:

*We may incur significant liability if it is determined that we are promoting the "off-label" use of drugs.*

**Companies may not promote approved drugs for "off-label" uses - that is, uses that are not described in the product's labeling and that differ from those approved by the FDA or other applicable regulatory agencies.** Physicians may prescribe approved drug products for off-label uses and such off-label uses are common across medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments for a given medical condition, the FDA and other regulatory agencies do restrict communications by pharmaceutical companies and their sales representatives regarding information concerning approved products for off-label use. The FDA and other regulatory agencies actively enforce regulations prohibiting promotion of approved products for off-label uses and the promotion of products for which marketing authorization has not been obtained. A company that is found to have promoted an approved product for off-label uses may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions.[18]

94.      Nonetheless, Avanir continued to illegally market Nuedexta for off-label use. What's more, Avanir stressed the importance of misrepresenting PBA to prescribers in order to meet its anticipated revenues over the near and long term in its Annual Report:

[A]lthough our approved product label is indicated to treat PBA, without regard to the underlying neurological condition, it is possible that physicians, the FDA's Office of Prescription Drug Promotion ("OPDP"), payers or others may interpret the label more narrowly than the FDA's Division of Neurology Products approval for a broad PBA label and ***believe that PBA secondary to certain conditions, such as Alzheimer's disease, is not an indicated use. If such misinterpretations are widespread, the***

---

[18] *Id.* at 32-33 (emphasis added).

FIRST AMENDED COMPLAINT / CASE NO. 8:22-cv-01026

***actual market size may be smaller than we have estimated.*** Accordingly, investors are cautioned not to place undue reliance on any particular estimates of equity research analysts or industry sources.[19]

95.     Avanir's Annual Report disclosed its U.S. commercial strategy for Nuedexta, which included the following "key objectives":

> *Increase awareness and appropriate diagnosis of PBA* — **Since PBA is under-diagnosed and often not treated, we use a range of tools to educate physicians and nurses about the prevalence of PBA**, the burden of the disease, the differential diagnosis versus depression, and encourage the utilization of screening tools to appropriately diagnose PBA in patients with underlying neurological disorders.

> *Expand adoption of NUEDEXTA* — **We are focused on driving awareness of NUEDEXTA and educating health care providers on the risks and benefits of the drug.** These interactions take place in a wide range of settings including physician offices, long term care facilities, speaker programs and medical meetings and conferences.[20]

96.     Through its illegal marketing of Nuedexta, Avanir was able to meet its "key objectives" by misrepresenting the prevalence of PBA thereby expanding the potential patient population and misleading prescribers into believing that their patients had PBA.

---

[19] *Id.* at 21 (emphasis added) & ("Our ability to generate revenue and achieve profitability in the near term is dependent on our ability, alone or with partners, to successfully market NUEDEXTA for the treatment of patients with PBA in the United States. We expect to continue to spend substantial amounts on the ongoing marketing of NUEDEXTA domestically for the treatment of PBA, invest in Europe to commercialize NUEDEXTA, and seek regulatory approvals for use of NUEDEXTA in other geographic markets and indications. As a result, we may be unable to generate sufficient revenue from product sales to become profitable or generate positive cash flows.").

[20] *Id.* at 7 (emphasis added).

This caused prescribers to write prescriptions for patients who had not been diagnosed with and did not have PBA.

97.     For its scheme to work, Avanir needed to ensure that Nuedexta was accessible to patients under their health insurance plan, whether under a commercial health insurance policy or Medicare. Avanir considered Nuedexta's pricing and the relation to formulary placement throughout its scheme to increase prescriptions. By purposely keeping prices lower, Nuedexta remained in a lower tier in a plan's formulary; thus, avoiding detection of proliferation and further scrutiny.[21]

98.     Avanir's aggressive marketing scheme touting the PRISM study and blurring the lines between PBA symptoms and a PBA diagnosis also induced Plaintiffs' Assignors and the TPP Class Members to largely eliminate formulary restrictions on Nuedexta.

99.     According to Avanir's internal documents, 66% of commercial health plans and 65% of Medicare Part D plans included Nuedexta in their formularies as a preferred drug without any restrictions in May 2015. Avanir touted the fact that nearly 9 million additional seniors had unrestricted access to Nuedexta from 2014 to 2015.

### 3. Avanir's Growth-Driven Incentive Compensation System Strongly Incentivizes Off-Label Marketing and Sales

100.    Avanir's incentive compensation program is designed to drive off-label marketing and sales of Nuedexta by focusing almost entirely on quarter-over-quarter sales growth within each sales representative's territory.

---

[21] Avanir emphasized the significance of coverage and reimbursement for Nuedexta because "[a] significant portion of [Avanir's] sales of NUEDEXTA come from patients who are covered under a third party reimbursement plan." Annual Report, *supra* note 17, at 29. Thus, "[a]ny adverse change in reimbursement policy affecting patients could potentially result in a change in patient co-payments. **For example, if a third party payor placed NUEDEXTA in a specialty tier, it could potentially result in a transition from a patient co-payment plan to a co-insurance plan for NUEDEXTA.**" *Id.* (emphasis added).

101.    Under this system, each sales representative is eligible for a quarterly performance bonus (paid shortly after the close of each quarter) that is almost entirely dependent on increasing the number of Nuedexta orders in comparison to the prior quarter within his/her sales territory. By focusing entirely on the sales growth (rather than sales volume or non-economic metrics) and shifting the baseline for measurement every quarter, Avanir's bonus system ceaselessly ratchets up sales expectations on a quarterly basis, regardless of whether the demand for on-label Nuedexta use has been fully saturated in a given territory.

102.    Upon information and belief, at the March 2015 National Sales Meeting, Avanir announced "Million Dollar Madness," an incentive contest above and beyond the already existing incentive bonus system, pursuant to which $1 million would be awarded to sales representatives and their regional managers. The PowerPoint presentation used at the National Sales Meeting to announce the contest includes an introductory slide announcing that "Award metrics give EVERYONE who grows their business a chance to win ENORMOUS payouts."

103.    The contest included the award of "Golden Tickets" for each month of growth, with the number of tickets awarded "compounded" for consecutive months of sales growth and "reset" if a sales representative fails to maintain month-after-month sales growth. The tickets were to be entered into drawings for fifteen cash prizes ranging from $10,000 to $30,000.

### 4. Avanir's Illegal Payments to Prescribers and Others to Induce Prescriptions for Nuedexta

104.    As demonstrated above, Plaintiffs' Assignors paid for Nuedexta prescriptions throughout the time that Avanir engaged in an illegal kickback scheme with prescribers to increase prescriptions of Nuedexta.

105.   Doctors take a Hippocratic Oath to treat patients to the best of their abilities and put patients first. Once in bed with Avanir, however, the line between doing what's best for a patient and obtaining profits for personal gain begins to blur.

106.   Avanir promotes Nuedexta through a speaker's bureau program. Through the speaker's program, Avanir engaged doctors to promote Nuedexta to other medical professionals using fraudulent marketing materials.

107.   Upon information and belief, typical speaking engagements were held in restaurants where Avanir would pay the physician a standard fee for each engagement, pay for the physician's meal, and reimburse the physician's travel expenses. In addition, Avanir held speaking engagements in a physician's own office where attendance would generally consist of often five to ten physicians.

108.   For the speaking engagements, Avanir limited a physician's presentation to materials prepared by Avanir and required the physician not deviate from the focus on the prevalence of PBA, the PRISM study, and off-label use of Nuedexta.

109.   For example, as recent as February 2022, the United States brought an action against Dr. Charles Nevels ("Dr. Nevels"), a psychiatrist in Tuscaloosa, Alabama, who engaged in an illegal scheme to cause fraudulent claims for payment for Nuedexta prescriptions for not medically accepted indications that resulted from kickbacks from Avanir.[22] According to the complaint, Dr. Nevels' 2016 speaker agreement with Avanir stated: "**Speaker must never use Speaker's own slides or other presentation materials for any purpose** . . . during the course of a Speaker Program." Similarly, Dr. Nevels' 2019 agreement provided: "**Speaker shall use only [Avanir]-approved presentation materials** . . . Speaker agrees not to alter or change any [Avanir] materials and/or presentations and to present the material in its entirety."[23]

---

[22] *United States v. Nevels*, *M.D.*, No. 7:22-cv-00149-ACA (N.D. Ala. filed Feb. 4, 2022).
[23] *Id.* at ¶ 36 (emphasis added).

110.   Avanir approves an annual speaker program budget, which is distributed to its sales representatives for them to use to pay prescribers of Nuedexta to appear at speaking engagements.

111.   Upon information and belief, Avanir evaluates employee performance solely on the number of prescriptions written, including refills, in each of the sales representatives' respective territories—not the number of new prescribers in the sales representatives' assigned territory. To further fuel employee performance, Avanir creates a competitive environment between the sales representatives by ranking them based on the number of prescriptions written in each of their territories and providing end of year incentives to the highest ranked employees.

112.   Avanir employees were tasked with maximizing the number of prescriptions in each of their territories and with minimal to indifferent oversight.[24]

113.   One way that Avanir sales representatives increased the number of prescriptions in their territories was by leveraging Avanir's speaker engagement budget.

114.   Avanir sales executives intended for speaker fees to be used to induce prescribers to increase prescriptions of Nuedexta.

115.   Avanir induced prescribers to become high prescribers of Nuedexta to beneficiaries of federal healthcare programs, offered prescribers financial incentives to write Nuedexta prescriptions for beneficiaries of federal healthcare programs, and induced prescribers to recommend that other prescribers prescribe Nuedexta to beneficiaries of federal healthcare programs, regardless of the patient's diagnosis.

---

[24] *Id.* at ¶¶ 47-51 (For example, the sales representative assigned to market Nuedexta to Dr. Nevels became one of Avanir's top sales representatives winning Avanir's President's Circle of Excellence award with 1,100% sales growth in 2012, winning Avanir's Million Dollar Sales Club award in 2013, and receiving several promotions, largely as a result of Dr. Nevel's prescriptions.).

FIRST AMENDED COMPLAINT / CASE NO. 8:22-cv-01026

116.   Avanir provided speaking engagements to physicians who constantly prescribed Nuedexta.

117.   Avanir utilized data on the Nuedexta prescribing practices of health care providers to determine which prescribers to pay for speaking engagements, including determining whether to add, keep or remove prescribers from its group of paid speakers.

118.   The kickbacks were not limited to speaking engagements. Executives and other employees at Avanir agreed to use payments to prescribers, including speaker fees and honoraria, to induce the prescribers to maintain and increase their Nuedexta prescribing volume.

119.   Avanir provided physicians with valuable patient referrals in exchange for Nuedexta prescriptions.

**5. Avanir Paid the Highest Prescribers of Nuedexta Thousands of Dollars**

120.   Over the years, Avanir has paid millions of dollars to prescribers of Nuedexta.[25]

121.   As noted above, physicians who wrote a high volume of Nuedexta prescriptions were rewarded with frequent speaker fees and meals. As an example, from October 2011 to February 2016, according to CMS's Open Payments data, Avanir paid Dr. Deepak Raheja ("Dr. Raheja") over $330,000 in honoraria for speaking engagements related to Nuedexta. Dr. Raheja gave approximately 211 speaking presentations, which Avanir paid approximately $1,500 for each presentation. During this time, Dr. Raheja was the highest prescribing doctor and wrote approximately 10,088 Nuedexta prescriptions.

---

[25] CMS collects information about financial relationships between doctors and pharmaceutical manufacturing companies from the manufacturers. Information about the data and the data itself can be accessed at www.cms.gov/OpenPayments/. *See* Avanir Pharm., Inc Payments, Open Payments, https://openpaymentsdata.cms.gov/company/100000005729 (last visited Nov. 2, 2022).

122.   In addition, from 2014 to 2020, Avanir paid Dr. Idan Sharon ("Dr. Sharon") 329 times, resulting in more than $260,000. Upon information and belief, Dr. Sharon is one of Nuedexta's highest prescribing doctors. Plaintiff's Assignors have paid for at least 30 claims for Nuedexta from Dr. Sharon, resulting in Plaintiff's Assignors paying at least $12,512.05 for Nuedexta.

123.   Further, from 2015 to 2019, Avanir paid Dr. Nevels over $400,000 to give approximately 178 presentations about Nuedexta.[26] In addition to the speaker fee, Avanir paid Dr. Nevels over $36,000 for claimed expenses associated with his presentations on behalf of Avanir.[27] Dr. Nevels was responsible for approximately 20% of Nuedexta prescriptions written for all Medicare beneficiaries in Alabama.[28]

### 6.  Avanir Was Aware of the Illicit Nature of These Payments

124.   Avanir knew that each Medicare and Medicaid provider is required to enter into a provider agreement with the government, and that under the terms of that agreement each Medicare or Medicaid provider certifies that it will comply with all laws and regulations concerning proper practices for those providers.

125.  A Medicare or Medicaid's provider's compliance with the provider agreement is a condition for receipt of payments under the Medicare or Medicaid program.

126.  As a result of Avanir's payments to physicians—including those to Dr. Raheja, Dr. Sharon and Dr. Nevels—and those physicians' receipt of those payments, the physicians became ineligible to receive payment under the Medicare or Medicaid programs.

127.  Avanir knew and intended that providers who were ineligible under the Medicare and Medicaid programs would submit claims for payment to the Medicare and Medicaid programs for the purchase and use of Nuedexta.

---

[26] *See supra* note 22, at ¶ 33.
[27] *Id.* at ¶ 34.
[28] *Id.* at ¶ 57.

128.   Avanir's kickbacks to the prescribers, in violation of federal law, cause those prescribers' respective prescriptions to be tainted by fraud. Accordingly, those prescriptions were ineligible for payment under the applicable federal regulations.

## V.   <u>THE NUEDEXTA ENTERPRISE</u>

129.   Avanir and the co-conspirators conducted or actively participated in conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Additionally, and in the alternative, Avanir and the co-conspirators, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Avanir's and the co-conspirators' actions (the "Nuedexta Enterprise") were in furtherance of the enterprise and in violation of 18 U.S.C. § 1962(d).

130.   The Nuedexta Enterprise participants include Avanir, the author-physicians who Avanir paid to produce the PRISM study, and the physicians who received kickbacks for prescribing Nuedexta for off-label purposes. The Nuedexta Enterprise is an association-in-fact between the Enterprise participants.

131.   The purpose of the Nuedexta Enterprise was to conceal from the TPPs the off-label marketing of Nuedexta and the amount of information the Assignors received regarding claims for payment of Nuedexta prescriptions so that the Nuedexta Enterprise participants could profit in some manner. The author-physicians of the PRISM study and the physicians who prescribed Nuedexta for off-label purposes, among others, profited from the various kickbacks. Although Avanir was the leader of the Nuedexta Enterprise, each Nuedexta Enterprise participant contributed to the purpose of concealing the off-label marketing of Nuedexta and financial incentives received as a result of writing additional Nuedexta prescriptions. Thus, each Nuedexta Enterprise participant actively contributed and advised the other Nuedexta Enterprise participants as part of the overall Enterprise.

132.   As alleged in detail above, Avanir and the Nuedexta Enterprise used marketing and tactics, and Avanir and the co-conspirators executed these strategies to increase the sales of Nuedexta throughout the United States, all while deceiving the TPPs.

## VI.   CLASS REPRESENTATION ALLEGATIONS

133.   Plaintiffs seeks to represent a Nationwide Class pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) as defined below:

> All third-party payers in the United States and its territories and possessions that paid for Nuedexta from 2011 through the present that was manufactured, distributed, or sold by Defendant.

134.   The Nationwide Class has a Subclass:

> All third-party payers that paid for Nuedexta prescriptions written by Dr. Deepak Raheja from 2011 through the present that was manufactured, distributed, or sold by Defendant.

135.   Plaintiffs allege additional sub-classes for all TPPs in each State, territory, or possession—or combination(s) of States, territories, or possessions to the extent class members from these jurisdictions can be grouped together for purposes of class treatment—who, paid any amount of money out of pocket for Nuedexta that was manufactured, distributed, or sold by Defendant (collectively, the "Subclasses").

136.   Collectively, the foregoing Nationwide Class and the Subclasses are referred to as the "Class."

137.   Excluded from the Class are: (a) Defendant; (b) any parent, subsidiary, or affiliate of Defendant; (c) any entity in which Defendant has or had a controlling interest, or which the Defendant otherwise controls or controlled; and (d) any officer, director, employee, legal representative, predecessor, successor, or assign of Defendant.

138.   Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class.

36

139.   **Numerosity**: Joinder of all members is impracticable. Upon information and belief, the Class is comprised of hundreds of TPPs, including commercial health plans, Medicare Advantage Organizations ("MAO"), first tier entities, down-stream entities, or their assignees throughout the United States of America and its territories, who paid for Nuedexta during the class period.

140.   **Existence and predominance of common questions of law and fact**: Questions of law and fact are common to all members of the Class. Specifically, Avanir's misconduct was directed at all Class Members and their affiliates. This is an action in which Plaintiffs and the Class Members assert claims alleging the same theory of recovery, namely that they have the right to recover damages for Avanir's unlawful scheme to increase Nuedexta prescriptions. Plaintiffs and Class Members' claims arise from the same practice or course of conduct: Avanir intentionally misled TPPs on the use of Nuedexta, misled TPPs as to the prevalence of PBA, misled TPPs as to what PBA actually is, paid physicians to increase their prescriptions of Nuedexta to patients regardless of whether the patient actually suffered from PBA, and paid certain physicians to spread misinformation on Nuedexta and PBA. Thus, all Class Members have common questions of fact and law, i.e., whether Avanir illegally marketed Nuedexta and caused the Class Members to pay for prescriptions of Nuedexta that physicians otherwise would never have written. Each Class Member shares the same needed remedy: reimbursement. Plaintiffs seek to enforce their own rights, as well as the rights of the Class Members.

141.   **Typicality**: Plaintiffs' claims are typical of the Class Members' claims, as Avanir has damaged all in the same manner. Plaintiffs' and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, share the same legal theory, and are not subject to any unique defenses. As the class representative, Plaintiffs possess the same interests and suffered the same injury as the other Class Members, which demonstrates a legally sufficient nexus between Plaintiffs' claims and

the Class Members' claims. Plaintiffs' claims are typical of the Class Members' claims because Avanir targeted TPPs in its illegal scheme to increase prescriptions of Nuedexta and Plaintiffs' Assignors, like the Class Members, paid for an increased number of prescriptions for a drug the FDA approved to treat a rare condition, PBA.

142. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests in vindicating these claims are shared with all Class Members, and there are no conflicts between the named plaintiff and the Class Members. Additionally, Plaintiffs are represented by counsel who are competent and experienced in class action litigation and have no conflicts.

143. The elements of Rule 23(b)(3) are met. Defendant has acted on grounds that apply generally to Class Members so that preliminary and/or final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

144. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this litigation because it is the most manageable and efficient way to resolve the individual claims of each Class Member. Specifically, a class action will provide Class Members with what may be their only economically viable remedy. Moreover, there are no known Class Members who are interested in individually controlling the prosecution of separate actions. Additionally, a class action will concentrate all litigation in one forum, which will conserve judicial and party resources with no unusual manageability problems.

145. In the alternative, Plaintiffs seek to certify a national issues class under Rule 23(c)(4).

146. Rule 23(c)(4) provides that an action may be brought or maintained as a class action with respect to particular issues when doing so would materially advance the litigation as a whole.

147.    In an effort to materially advance the litigation as a whole, pursuant to Rule 23(c)(4), Plaintiffs bring this action on behalf of itself and the Class Members to resolve, *inter alia*, several important issues, including: whether Avanir intentionally misled TPPs on the use of Nuedexta, whether Avanir misled TPPs as to the prevalence of PBA, whether Avanir misled TPPs as to what PBA actually is, whether Avanir paid certain physicians to increase their prescriptions of Nuedexta to patients regardless of whether the patient actually suffered from PBA, and whether Avanir paid certain physicians to spread misinformation on Nuedexta and PBA, and whether Avanir illegally marketed Nuedexta and caused the Class Members to pay for prescriptions of Nuedexta that physicians otherwise would never have written.

## VII.   <u>TOLLING</u>

148.    Plaintiffs' Assignors and the Class Members had no way of knowing about Avanir's illegal scheme to increase Nuedexta prescriptions.

149.    Avanir and the physicians it paid refused to disclose the true nature of their relationship regarding Nuedexta prescriptions.

150.    Within the applicable statutes of limitation, Plaintiffs' Assignors and the Class Members could not have discovered, through exercise of reasonable diligence, that Avanir was concealing the conduct complained of herein and misrepresenting its marketing practices, the illegal kickbacks, and the prevalence of PBA.

151.    Although Avanir and physicians reported payments on Medicare's Open Payments system, the true nature of the scheme went unreported, and Plaintiffs' Assignors and the Class Members had no way of knowing the true invidious nature of these payments.

152.    On September 24, 2019, a *qui tam* suit was unsealed. This suit, for the first time, explained how payments to physicians were being used as quid pro quo to increase

Nuedexta sales to drive profits up to the detriment of Plaintiffs' Assignors and the Class Members.

153.   On September 26, 2019, the DOJ filed a criminal information that demonstrated how Avanir was controlling the Nuedexta scheme.

154.   On October 2, 2019, through a DPA with the DOJ, Avanir, for the first time, admitted its role in the Nuedexta scheme. In the DPA, Avanir admitted that its sales and marketing management sought to conceal communications from detection. In one exchange of messages, an Avanir executed instructed another executive to "make sure to delete your text messages." In that same exchange of messages, one executive asked if text messages are discoverable if deleted. In a separate message exchange, one Avanir employee asked an Avanir executive to no longer send emails regarding the scheme.

155.   It was only in 2019 that the public (including Plaintiffs' Assignors and the Class Members) could have become aware of Avanir's scheme to increase prescriptions of Nuedexta. The unsealing of the *qui tam* complaint, along with the DOJ's criminal information against Avanir, was the first time that Avanir's Nuedexta scheme was revealed with first-hand accounts of how the scheme operated and how Avanir took steps to conceal its actions.

156.   Through this active concealment, and Avanir's repeated insistence of lacking any impropriety, Plaintiffs' Assignors, the Class Members, and any reasonable person, had no way of knowing the nature and prevalence of the Nuedexta scheme.

157.   Further, all documents that would lead a reasonable person to suspect that the Nuedexta scheme was ongoing, and is currently still ongoing, are in Avanir's exclusive custody and control.

158.   Plaintiffs' Assignors and the Class Members did not discover, and did not know of facts, which would have led a reasonable person to suspect that Avanir was engaged in an illegal scheme to increase Nuedexta prescriptions.

159.   Accordingly, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to all claims relating to Nuedexta.

## VIII.  <u>CAUSES OF ACTION</u>

### COUNT I
### <u>VIOLATION OF 18 U.S.C. § 1962(c)</u>

160.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 159 as if fully set forth here.

161.   Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

162.   At all relevant times, Avanir is and has been a "person" under 18 U.S.C. § 1961(3) because it was capable of holding "a legal or beneficial interest in property."

163.   Avanir violated 18 U.S.C. § 1962(c) and injured the business or property of the Plaintiffs and the Nationwide Class. Each Plaintiff is a "person" as defined in 18 U.S.C. § 1964(c) because they were and are being injured in their business and property "by reason of" the RICO violations alleged herein.

### a. Defendant Conducted and Participated in the Affairs of an Association-in-Fact Enterprise With a Common Purpose to Maximize Profits for Nuedexta

164.   Defendant and the co-conspirators conducted or participated in the affairs of an "association-in-fact enterprise"—i.e., the Nuedexta Enterprise—through a pattern of racketeering activity (comprised of predicate racketeering acts of mail and wire fraud) in violation of 18 U.S.C. § 1962(c). The Nuedexta Enterprise engaged in this pattern of illegal activities in furtherance of its common purpose to maximize profits for Nuedexta by fraudulently marketing Nuedexta for non-FDA approved uses, paying prescribers to increase their prescription volume of Nuedexta and misleading and inducing other

41

prescribers throughout the country to prescribe Nuedexta for non-FDA approved uses. In doing so, Defendant and the unnamed co-conspirators knowingly conducted and participated in a pattern of mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

165.   The Nuedexta Enterprise included: Avanir; physician authors who produced false medical literature related to the prevalence of PBA; group home directors providing lists of beneficiaries to Avanir for off-label prescribing to receive higher ratings from CMS; additional physician authors to produce false medical literature for the agitation of Alzheimer's disease, depression, and autism; and physicians receiving kickbacks for prescribing Nuedexta for non-FDA approved uses. Discovery will likely reveal additional members of the Nuedexta Enterprise that are not currently known to Plaintiffs.

166.   As the architect of the Nuedexta Enterprise, Avanir created the misinformation campaign regarding PBA prevalence and dissemination of false and misleading advertisements regarding Nuedexta's use in patients who do not have ALS or MS. Likewise, Avanir orchestrated the remuneration paid to physicians prescribing Nuedexta and promotion of Nuedexta for off-label uses.

167.   Avanir and the co-conspirators each participated in the Nuedexta Enterprise, played a distinct role in furthering the enterprise's common purpose of maximizing profits for Nuedexta.

168.   Specifically, Avanir and the co-conspirators worked together to coordinate the enterprise's goals, conceal the existence of the enterprise, and conceal their individual roles. Further, Defendant and the co-conspirators were linked through their business relationships and continuing coordination of activities. This business relationship facilitated the formation of a common purpose among Avanir and the co-conspirators, who each agreed to participate in the conduct of their Nuedexta Enterprise. Avanir and the co-conspirators played a critical role in concealing the amount of information Plaintiffs'

Assignors received regarding claims for payment of Nuedexta prescriptions, materially resulting in Plaintiffs' Assignors reimbursing for Nuedexta prescriptions they otherwise would not have paid for.

169.   At all relevant times, the Nuedexta Enterprise: (i) had an existence that was separate and distinct from Defendant and their members; (ii) was separate and distinct from the pattern of racketeering in which Defendant and the co-conspirators engaged; (iii) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including Defendant; (iv) was characterized by business relationships between and among Defendant and the co-conspirators; and (v) had sufficient longevity for the Enterprise to pursue its common purpose and function as a unit.

170.   Avanir and the co-conspirators participated in the conduct of the Nuedexta Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud). This was done to increase profits for Nuedexta by hiding and misrepresenting the prevalence of PBA to increase the number of prescriptions for Nuedexta.

171.   The Nuedexta Enterprise engaged in and affected interstate commerce because it marketed, promoted, sold or provided Nuedexta to thousands of individuals and entities through the United States.

**b.  Defendant's Nuedexta Enterprise had a Common Purpose**

172.    Defendant's Nuedexta Enterprise came together for the common purpose of perpetuating a fraudulent scheme to conceal from patients, prescribers, third-party payors, and hospitals the prevalence of PBA causing an increase of prescriptions for Nuedexta for non-FDA approved uses. This concealment was directed at allowing the enterprise participants to profit from the sale of Nuedexta.

173.   By knowingly concealing the prevalence of PBA and marketing Nuedexta for non-FDA approved uses, Avanir and the other enterprise participants could (and did)

misrepresent information regarding claims for payment for Nuedexta prescriptions. These false representations resulted in significant revenue from sales of Nuedexta.

174. Defendant and the other enterprise participants profited, directly or indirectly from the scheme.

175. This common purpose served the interests of all of the Nuedexta Enterprise participants.

### c. Defendant's Nuedexta Enterprise had an Ongoing Organization

176. Avanir, in concert with other participants in the Nuedexta Enterprise, created and maintained systematic links for a common purpose, to aid in marketing Nuedexta as an effective and safe alternative for treatment of conditions beyond PBA as well as broadening the definition of PBA beyond its accepted use in the medical community. The Nuedexta Enterprise improperly induced physicians to prescribe, and TPPs to pay for, Nuedexta.

177. Each of the enterprise participants received substantial revenue from the fraudulent scheme to promote Nuedexta as safe and effective beyond its intended uses. The paid physicians, among others, profited from speaking fees, consulting fees, honoraria, and reimbursements. Such revenue was greater than it would have been if Avanir had properly marketed Nuedexta.

178. All enterprise participants were aware of Avanir's control over the activities of the Nuedexta Enterprise in promoting Nuedexta. Furthermore, each portion of the enterprise benefited from the existence of the other parts.

### d. Defendant Committed at Least Two Predicate Acts of Mail and Wire Fraud in Furtherance of the Nuedexta Enterprise's Fraudulent Scheme

179. The Nuedexta Enterprise devised and conducted an unlawful scheme to defraud prescribers and TPPs by falsely marketing and promoting Nuedexta to thousands of individuals and entities throughout the United States to be an effective treatment for

FIRST AMENDED COMPLAINT / CASE NO. 8:22-cv-01026

symptoms PBA of anything other than its FDA-approved use so that Plaintiff's Assignors unnecessarily paid for Nuedexta to treat symptoms that were not scientifically proven to be safe and effective

180.   In addition, the Nuedexta Enterprise devised and conducted an unlawful scheme to obtain money by fraudulent pretenses and maximize the sales of Nuedexta. This scheme financially enriched Defendant and the Nuedexta Enterprise.

181.   In furtherance of this scheme, Defendant knowingly conducted or participated, directly or indirectly, in the Nuedexta Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, Defendant committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity within the past ten years, which constituted a pattern of racketeering activity. This pattern of racketeering activity was made possible by Defendant's regular use of the facilities, services, distribution channels and employees of the Nuedexta Enterprise, the U.S. Mail and interstate wire facilities. Defendant participated in the scheme to defraud by using mail, telephones and the Internet to transmit mailings and wires in interstate or foreign commerce.

182.   Defendant used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications to further the Nuedexta Enterprise's unlawful goals through material misrepresentations, concealments, and omissions.

183.   Defendant caused such mailings and uses of the wires to be made both by directly making or approving fraudulent statements and by setting in motion a scheme to defraud that would reasonably lead to those mailings and wires. These multiple acts of racketeering activity were related to each other, pose a threat of continued racketeering activity, and constitute a pattern of racketeering activity.

184.   Defendant's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.   Mail Fraud: Defendant violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, claims for not-medically-indicated and not-medically-necessary prescriptions for Nuedexta for patients who did not have symptoms consistent with PBA, had no prior PBA diagnosis, or were otherwise tainted by fraud based on the Defendant's unlawful kickbacks by U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to market, and sell Nuedexta through false pretenses and promises, and material misrepresentations and omissions.

b.   Wire Fraud:  Defendant violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, claims for not-medically-indicated and not-medically-necessary prescriptions for Nuedexta for patients who did not have symptoms consistent with PBA, had no prior PBA diagnosis, or were otherwise tainted by fraud based on the Defendant's unlawful kickbacks by wire for the purpose of executing the unlawful scheme to defraud and obtain money through false pretenses and promises, and material misrepresentations and omissions.

185.   Defendant's use of the mails and wires include, but are not limited to, the transmission of the following by Defendant or third parties that were foreseeably caused to be sent in furtherance, and as a result of, Defendant's unlawful scheme to defraud:

a.   Advertisements and marketing from Avanir for Nuedexta prescriptions for not-medically-indicated and not-medically-necessary symptoms consistent with PBA by misrepresenting Nuedexta and the prevalence of PBA, which were distributed using mail, wire, radio, or television communications in interstate commerce. Each such mailed

46

advertisement—including brochures or print advertisements—violated the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement violated the wire fraud statute (18 U.S.C. § 1343);

b.    False or misleading communications with and among the Nuedexta Enterprise participants that misrepresented the safety and risks of Nuedexta and information related to PBA amongst themselves and others;

c.    False or misleading communications with Plaintiffs' Assignors and the Class Members and/or their agents, inducing a lower placement of their respective drug formularies for Nuedexta by misrepresenting Nuedexta and the prevalence of PBA;

d.    False or misleading communications with Plaintiffs' Assignors and the Class Members and/or their agents, inducing payments for Nuedexta prescriptions for not-medically-indicated and not-medically-necessary symptoms consistent with PBA by misrepresenting Nuedexta and the prevalence of PBA;

e.    Receiving the proceeds in the course of and resulting from Avanir's improper scheme;

f.    Transmittal and receipt of monies from Plaintiffs' Assignors or their agents for Nuedexta prescriptions for not-medically-indicated and not-medically-necessary symptoms consistent with PBA; and

g.    Transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the Nuedexta Enterprise.

186.   Avanir's fraudulent scheme consisted of, *inter alia*: (a) deliberately misrepresenting what PBA was and the rarity of PBA in the general population; (b)

misrepresenting the effectiveness of Nuedexta for treatment of anything other than its FDA-approved use so that Plaintiff's Assignors unnecessarily paid for Nuedexta to treat symptoms that were not scientifically proven to be safe and effective; and (c) actively concealing and causing others to conceal, information about PBA.

187.    At all times during the fraudulent scheme, Avanir and the Enterprise participants had a legal and ethical obligation of candor to, and honest dealing with, public and private TPPs, physicians, and the medical community. Further, as the manufacturer of Nuedexta, it was unlawful for Avanir to promote Nuedexta for off-label use.

188.    Avanir caused each Nuedexta prescription to be written for not-medically-indicated and not-medically-necessary because there was no underlying PBA diagnosis and submissions for payment in such circumstances constitutes a predicate act within the meaning of 18 U.S.C. § 1961(1).

189.    The conduct of the Nuedexta Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

190.    Avanir's decisions and activities in connection with the Nuedexta Enterprise to routinely conduct their transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

### e.  Defendant's Nuedexta Enterprise's Pattern of Racketeering Injured Plaintiffs and the Class Members in Their Business or Property When They Paid for Nuedexta

191.    Each of the Plaintiffs and Nationwide Class members is a "person injured in his or her business or property" by reason of the Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c). Plaintiffs and Nationwide Class members have the right to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

192.    Plaintiffs' Assignors and the Class Members have been injured in their property by reason of these violations in that Plaintiffs' Assignors paid more for Nuedexta

than they otherwise would have paid had Avanir not engaged in this pattern of racketeering activity.

193.    The injuries to Plaintiffs' Assignors and the Class Members were directly and proximately caused by Avanir's racketeering activity as Avanir knew health plans pay for prescription drugs.

194.    TPPs, including Plaintiffs' Assignors and Class Members, directly relied on the racketeering activities of Avanir and the Nuedexta Enterprise. This caused Plaintiffs' Assignors and the Class Members to place Nuedexta lower on their respective drug formularies. Avanir also purposely kept the cost of Nuedexta low to ensure it remained in a lower tier in Plaintiffs' Assignors' and the Class Members' formularies, thereby evading stricter scrutiny.

195.    By virtue of these violations of 18 U.S.C. § 1962(c), Avanir is liable to Plaintiffs and the Class Members for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

196.    By reason of the foregoing, and as a direct and proximate result of Avanir's fraudulent misrepresentations, Plaintiffs' Assignors and the Class Members have suffered damages. Plaintiffs and the Class is entitled to compensatory damages, punitive damages, costs and reasonable attorneys' fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)

197.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 159 as if fully set forth here.

198.    Avanir and the enterprise participants, as co-conspirators, violated 18 U.S.C. § 1962(d) by conspiring to violate section 1962(c). The object of the conspiracy was to participate in the conduct of the affairs of the Nuedexta Enterprise through a pattern of racketeering. Avanir conspired with prescribing physicians to promote Nuedexta by

49

expanding the meaning of PBA, marketing its off-label use, and inducing physicians to prescribe Nuedexta without regard to a patient's actual diagnosis.

199.   Avanir and the other co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including inducing prescribers to increase their prescriptions of Nuedexta through a series of kickbacks.

200.   Avanir was aware that its fraudulent acts were part of an overall pattern of racketeering activity. Avanir knew that expanding the definition of PBA to physicians would lead to increased prescriptions of Nuedexta.

201.   The conspiring prescribing physicians, as enrolled Medicare providers, were required to certify that they understood that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction not being false.

202.   The monies Avanir paid to the prescribing physicians in speaker fees, meals, honoraria and travel alone is evidence that the physicians' arrangement with Avanir was financial inducement to increase the physicians' use of Nuedexta.

203.   As Avanir has already admitted, its sales executives intended for speaker fees to be used to induce prescribers to increase prescriptions of Nuedexta.

204.   In an exchange of messages, Avanir employees directly linked the increased speaker program funding to increasing prescriptions. For instance, a regional business manager said that one method of increasing prescriptions of Nuedexta was to have educational programs for which a doctor would be paid.

205.   Avanir ranked its employees by the number of prescriptions written in their respective regions within a given year, which encouraged employees to compete against each other for speaker program funding to give to physicians in exchange for higher prescriptions.

206.   In another exchange of messages between a physician and an Avanir employee, the employee informed the prescriber that "[Avanir] ha[d] 20 programs

FIRST AMENDED COMPLAINT / CASE NO. 8:22-cv-01026

scheduled for Q1, compared to 6 last year in Q1 . . . ." According to another Avanir employee, that same physician "said he will rx 20 [Nuedexta prescriptions] from now until the end of the month."

207.   Through the kickback scheme, Avanir paid this physician more than $330,000 in speaker fees and honoraria. As the highest prescriber of Nuedexta, this doctor alone wrote thousands of prescriptions.

208.   The nature of the co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

209.   As a direct and proximate result of Avanir's and the Enterprise's overt and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs' Assignors and the Class Members have been injured in their property as set forth more fully above.

210.   Avanir sought and engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

      (a)   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

      (b)   Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

      (c)   Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and

      (d)   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

211.   Plaintiffs' Assignors and the Class Members have been injured because of these violations. Plaintiffs' Assignors paid for Nuedexta prescriptions during the time of the Nuedexta Enterprise. Plaintiffs' Assignors would have paid for fewer Nuedexta prescriptions had Avanir not conspired to violate 18 U.S.C. § 1962(c).

212.   Avanir's racketeering activity directly and proximately caused injury to Plaintiffs' Assignors and the Class Members.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, pray for the following relief:

A.   An order that this action satisfies the prerequisites for maintenance of a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), and certify the respective Classes;

B.   An order designating Plaintiffs as the representative for the respective Classes and Plaintiffs' undersigned counsel as Class Counsel for the respective Classes; and

C.   Judgement against Defendant that:

    i.   Award compensatory damages;

    ii.   Award punitive damages;

    iii.   Award costs of litigation, including reasonable attorneys' fees;

    iv.   Award such other relief as the Court deems appropriate.

## X.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  November 14, 2022                Respectfully submitted,

**RIVERO MESTRE LLP**

52

2525 Ponce de Leon Blvd., Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile: (305) 445-2505
E-mail: amcgovern@riveromestre.com
E-mail: ddaponte@riveromestre.com


By:   /s/ Amanda McGovern
AMANDA MCGOVERN
(*pro hac vice*)
Florida Bar No. 964263
DAVID DAPONTE
(*pro hac vice*)
Florida Bar No. 1002724

**MSP RECOVERY LAW FIRM**
*Attorneys for Plaintiffs*
2701 S Lejeune Road 10th Floor
Coral Gables, Florida, 33134
John W. Cleary, Fla. Bar No. 118137
(*pro hac vice*)
jcleary@msprecoverylawfirm.com
Phone: (305) 614-2222
Serve:serve@msprecoverylawfirm.com


**ARMAS BERTRAN ZINCONE**
*Attorneys for Plaintiffs*
4960 SW 72 Avenue, Ste. 206
Miami, Florida 33155
Eduardo E. Bertran, Fla. Bar No. 94087
(*pro hac vice*)
ebertran@armaslaw.com
Phone: 305-661-2021

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
*Attorneys for Plaintiffs*

53

800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Phone: (919) 600-5000
Alex R. Straus, Cal. Bar No. 321366
astraus@milberg.com

FIRST AMENDED COMPLAINT / CASE NO. 8:22-cv-01026

## **CERTIFICATE OF SERVICE**

I, Amanda McGovern, hereby certify that, on November 14, 2022, I electronically filed the foregoing document with the Clerk for the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to counsel of record.

/s/ *Amanda McGovern*
Amanda McGovern

FIRST AMENDED COMPLAINT / CASE NO. 8:22-cv-01026